### In re HOLOCAUST VICTIM ASSETS LITIGATION.

**This Document Relates to All Cases.**

**Nos. 96 Civ. 4849 (ERK)(MDG), 99 Civ. 5161 and 97 Civ. 461.**

United States District Court, E.D. New York.

July 26, 2000.

As Corrected Aug. 2, 2000.

Burt Neuborne, New York University Law School, New York, NY, lead class counsel.

Michael D. Hausfeld, Paul T. Gallagher, Cohen, Milstein, Hausfeld & toll, P.L.L.c., Washington, DC, Robert L. Lieff, Elizabeth J. Cabraser, Morris A. Ratner, Lisa J. Leebove, Lieff, Cabraser, Heimann & Bernstein, LLP, New York, NY, Melvyn I. Weiss, Deborah Sturman, Milberg Weiss Bershad Hynes & Lerach, LLP, New York, NY, Robert A. Swift, Kohn, Swift & Graf, P.C., Philadelphia, PA, Irwin Levin, Richard Shevitz, Cohen & Malad, P.C., Indianapolis, IN, Ed Fagan, Fagan & D'Avino, New York, NY, Stephen Whinston, Berger & Montague, P.C., Philadelphia, PA, Mel Urbach, Fort Lee, NJ, Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Martin Mendelsohn, Verner, Liipfert, Bernard, McPherson & Hand, Charter, Washington, DC, Barry Fisher, Fleishman, Fisher & Moest, Los Angeles, CA, Stanley M. Chesley, Jeannie Geoppinger, WEaite, Schneider, Bayless & Chesley, Co., L.P.A., Cincinnati, OH, class counsel.

Roger M. Witten, Wilmer, Cutler & Pickering, Washington, DC, for defendants.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

I address here the legal issue of the fairness of the $1.25 billion settlement of the Holocaust Victim Assets Litigation against two leading Swiss banks. The words of Ernest Lobet, a survivor of the Holocaust, provide the best summary of the conclusion that I reach after the analysis to follow:

> I have no quarrel with the settlement. I do not say it is fair, because fairness is a relative term. No amount of money can possibly be fair under those circumstances, but I'm quite sure it is the very best that could be done by the groups that negotiated for the settlement. The world is not perfect and the people that negotiated I'm sure tried their very best, and I think they deserve our coop-

eration and ... that they be supported and the settlement be approved.

Transcript of Fairness Hearing, November 29, 1999, at 146.

## Background and Procedural History

### I. Nature of the Lawsuit and Proposed Settlement

Beginning in late 1996 and early 1997, plaintiffs filed a series of class action lawsuits against defendants. The original class action complaints were amended and refiled in July 1997 as four separate actions, consolidated under Master Docket No. 96 Civ. 4849: *Sonabend, et al. v. Union Bank of Switzerland, et al.; Trilling–Grotch, et al. v. Union Bank of Switzerland, et al.; Weisshaus, et al. v. Union Bank of Switzerland, et al.;* and *World Council of Orthodox Jewish Communities, Inc., et al. v. Union Bank of Switzerland, et al.*

Plaintiffs alleged that, before and during World War II, they were subjected to persecution by the Nazi regime, including genocide, wholesale and systematic looting of personal and business property and slave labor. Plaintiffs alleged that, in knowingly retaining and concealing the assets of Holocaust victims, accepting and laundering illegally obtained Nazi loot and transacting in the profits of slave labor, Swiss institutions and entities, including the named defendants, collaborated with and aided the Nazi regime in furtherance of war crimes, crimes against humanity, crimes against peace, slave labor and genocide. Plaintiffs also alleged that defendants breached fiduciary and other duties; breached contracts; converted plaintiffs' property; enriched themselves unjustly; were negligent; violated customary international law, Swiss banking law and the Swiss commercial code of obligations; engaged in fraud and conspiracy; and concealed relevant facts from the named plaintiffs and the plaintiff class members in an effort to frustrate plaintiffs' ability to pursue their claims. · Plaintiffs sought an accounting, disgorgement, compensatory

and punitive damages, and declaratory and other appropriate relief.

In May 1997, defendants filed motions to dismiss the litigation, or, in the alternative, for a stay. The motions, supported by expert affidavits, argued that the actions should be dismissed because plaintiffs failed to state claims under Swiss and international law, failed to join indispensable parties, lacked personal and subject matter jurisdiction, and lacked standing. Defendants also argued that I should abstain from adjudicating plaintiffs' claims in favor of ongoing non-judicial initiatives to redress all of plaintiffs' claims, and argued that Switzerland, not the United States, was the proper forum for plaintiffs to pursue the relief to which they believed they were entitled. I heard lengthy argument on defendants' motions on July 31, 1997. At argument, I voiced concerns about the viability of certain causes of action and I identified several additional legal issues that the parties subsequently addressed in post-hearing memoranda of law. While the motions to dismiss were pending, the parties engaged in discussions resulting in a Settlement Agreement, which made it unnecessary for me to decide the motions.

The settlement discussions were facilitated, initially, by former United States Under Secretary of State, now Deputy Secretary of Treasury, Stuart Eizenstat. Subsequently, I became intimately involved in the settlement discussions that led to an agreement in principle in August 1998. The key terms of the proposed Settlement Agreement are as follows:

1. *Settlement Fund:* Defendants have agreed to pay $1.25 billion, in four installments, over the course of three years. Pursuant to the terms of the Settlement Agreement, defendants paid the first and second installments into an escrow fund on November 23, 1998 and 1999, respectively. As originally set forth in the Settlement Agreement, the two remaining payments were to be made on November 23, 2000 and 2001, respectively. However, the parties have agreed to amend the Settlement Agreement to provide for acceleration of certain payments and modification of the flow of funds between the escrow fund and the settlement fund in order to generate additional interest payments payable to the settlement fund. The additional interest payments are designed to partially defray the cost of the claims process for the Deposited Assets Class, which is defined below.

2. *Defenses Waived:* As part of the settlement, defendants have foregone potentially dispositive legal and factual defenses, including the following: (i) whether this dispute is justiciable, (ii) whether plaintiffs' claims are barred under applicable foreign law, (iii) whether plaintiffs have standing to assert various claims and (iv) whether the claims are time-barred under applicable statutes of limitation and repose, or by the doctrine of prescription.

3. *Revival of Claims:* The settlement protects class members whose claims may otherwise have been deemed expired under applicable statutes of limitation and repose.

4. *Distribution:* The settlement does not preordain a plan for distribution of the settlement fund. Instead, the settlement sets forth a fair and open mechanism for the development of criteria pursuant to which distribution and allocation determinations will be made.

5. *Settled Claims:* In exchange for the settlement amount paid by the settling defendants, settling plaintiffs and settlement class members have agreed irrevocably and unconditionally to release, acquit and forever discharge certain releasees from any and all claims relating to the Holocaust, World War II and its prelude and aftermath, victims or targets of Nazi persecution, transactions with

or actions of or in connection with the Nazi regime, treatment by the Swiss Confederation or other releasees of refugees fleeing persecution, or any related cause or thing whatever. Certain limited exceptions are detailed in the Settlement Agreement. The settlement resolves not only the cases coordinated as part of the above-captioned proceeding, but also resolves additional related cases, including cases in California and Washington, D.C. captioned *Markovicova, et al. v. Union Bank of Switzerland, et al.,* Case No. C98–2924 (N.D.Cal.), and *Rosenberg, et al. v. Swiss National Bank,* Case No. 1:98–CV–01647 (D.D.C.).

6. *Class Beneficiaries:* The parties agreed that the settlement should benefit generally persons recognized as targets of systematic Nazi oppression on the basis of race, religion or personal status. Declaration of Burt Neuborne, Esq. (Nov. 5, 1999) ("Neuborne Decl. I") ¶ 23. Accordingly, at the initiative of plaintiffs' Executive Committee, the settlement was explicitly designed to benefit Jews, homosexuals, Jehovah's Witnesses, the disabled and Romani—groups recognized by the United Nations as having been the targets of systematic Nazi persecution on the basis of race, religion or personal status. *Id.* Thus, four of the five settlement classes defined below benefit these targets of Nazi persecution.

Because the defendant banks sought to settle not only the causes of action alleged against them, but were seeking to resolve legal claims against Swiss governmental and business entities, the releases described in the fifth numbered paragraph above included entities that were not named as defendants in this case. *See* Settlement Agreement ¶ 1 (definition of "Releasees"). Also for this reason, at least one of the five settlement classes described below, the Refugee Class, includes victims of Nazi persecution who did not suffer any injury as a direct or indirect result of conduct of the defendant banks or of any Swiss banks.

## II. *The Settlement Evaluation Process*

### A. *Preliminary Approval and Class Certification*

In an order dated March 30, 1999, I preliminarily approved the proposed settlement and certified five settlement classes under Fed.R.Civ.P. 23(a) and 23(b)(3). The classes certified were the following:

1. *Deposited Assets Class:* The Deposited Assets Class consists of victims or targets of Nazi persecution and their heirs, successors, administrators, executors, affiliates and assigns who have or at any time have asserted, assert or may in the future seek to assert claims against any releasee for relief of any kind whatsoever relating to or arising in any way from deposited assets or any effort to recover deposited assets.

2. *Looted Assets Class:* The Looted Assets Class consists of victims or targets of Nazi persecution and their heirs, successors, administrators, executors, affiliates and assigns who have or at any time have asserted, assert or may in the future seek to assert claims against any releasee for relief of any kind whatsoever relating to or arising in any way from looted assets or cloaked assets or any effort to recover looted assets or cloaked assets.

3. *Slave Labor Class I:* Slave Labor Class I consists of victims or targets of Nazi persecution and their heirs, executors, administrators and assigns who actually or allegedly performed slave labor for companies or entities that actually or allegedly deposited the revenues or proceeds of that labor with, or transacted such

revenues or proceeds through, releasees, and who have or at any time have asserted, assert or may in the future seek to assert claims against any releasee for relief of any kind whatsoever relating to or arising in any way from the deposit of such revenues or proceeds or cloaked assets or any effort to obtain redress in connection with the revenues or proceeds from slave labor or cloaked assets.

4. *Slave Labor Class II:* Slave Labor Class II consists of individuals and their heirs, executors, administrators and assigns who actually or allegedly performed slave labor at any facility or work site, wherever located, actually or allegedly owned, controlled or operated by any corporation or other business concern headquartered, organized or based in Switzerland or any affiliate thereof, and who have or at any time have asserted, assert or may in the future seek to assert claims against any releasee other than settling defendants, the Swiss National Bank, and other Swiss banks for relief of any kind whatsoever relating to or arising in any way from such slave labor or cloaked assets or any effort to obtain redress in connection with slave labor or cloaked assets.

5. *Refugee Class:* The Refugee Class consists of victims or targets of Nazi persecution and their heirs, executors, administrators and assigns who sought entry into Switzerland in whole or in part to avoid Nazi persecution and who actually or allegedly either were denied entry into Switzerland or, after gaining entry, were deported, detained, abused or otherwise mistreated, and who have or at any time have asserted, assert or may in the future seek to assert claims against any releasee for relief of any kind whatsoever relating to or arising in any way from such actual or alleged denial of entry, deportation, detention, abuse or other mistreatment.

## B. *Dissemination of Notice*

My grant of preliminary approval and class certification allowed for implementation of the second step in the settlement evaluation process—*i.e.,* dissemination of notice of the proposed settlement and class certification to the settlement classes. *See* Federal Judicial Center, *Manual for Complex Litigation—Third* (*"MCL 3d"*) §§ 30.212, 30.41 (1995).

The notice plan, which I approved in an order dated May 10, 1999, was tailored to the unique circumstances of this case; was effective as implemented, as discussed below, in that it provided the best notice practicable under the circumstances in terms of content, format and dissemination; and satisfied due process requirements and Fed.R.Civ.P. 23(c). There is no list of all the members of the settlement classes that would have permitted the notice administrators to send notice exclusively by direct mail to all settlement class members. Instead, I directed settlement class counsel, through four notice administrators, to implement the multi-faceted notice plan, involving, in addition to direct mail utilizing existing lists covering segments of the settlement classes, worldwide publication, public relations (*i.e.,* "earned media"), Internet and grass roots community outreach.

Each of the court-appointed notice administrators oversaw distinct aspects of the notice plan, and their various reports filed with the court detail the exhaustive efforts undertaken to give all settlement class members an opportunity to learn of their rights, evaluate the basic terms of the proposed settlement and comment, either by submitting correspondence, e-mailing the notice administrators or returning an Initial Questionnaire.

Each element of the notice plan that I approved has been successfully implemented, including the following: (i) world-wide

publication, (ii) press coverage, (iii) an extensive community outreach program, (iv) a direct mail program that included the sending of more than 1.4 million notice packages directly to potential class members in at least 48 countries and (v) an Internet notice effort.

### C. *Fairness Hearings*

The third and final step in the class action settlement evaluation process was a final approval hearing, also known as a "fairness hearing," pursuant to Fed. R.Civ.P. 23(e). I held a fairness hearing in the United States District Court for the Eastern District of New York on November 29, 1999. The hearing was open to all settlement class members. I also conducted and presided (by electronic hookup) over a supplemental fairness hearing that was held in Israel on December 14, 1999. The hearing was open to a random sampling of Israelis who submitted Initial Questionnaires in response to the notice. I have considered the views of the settlement class members presented at these final approval hearings, and through the written correspondence of class members, whether submitted in hard copy or by e-mail.

### D. *Subsequent Amendments to the Settlement Agreement*

After preliminary approval, the parties amended the Settlement Agreement and escrow agreement to provide that settling defendants would pay the second installment of the settlement amount into the escrow fund, to permit the escrow agents to authorize disbursements of up to $20 million in the aggregate for payment of certain costs incurred in implementing the settlement, and to permit the escrow agents to authorize additional disbursements from the escrow fund for settlement implementation costs, subject to court approval.

The parties have made additional modifications to the Settlement Agreement since its preliminary approval. These modifica-

tions will be discussed in the part of this memorandum that addresses the objections and comments to the Settlement Agreement made in response to the notice of proposed settlement. I add this caveat: just as I was ready to release this opinion last week, counsel for the defendant banks threatened to repudiate the modifications because he was unhappy with certain good faith obligations imposed upon the releasees to provide information necessary to allow members of the plaintiff class to obtain the benefits of the Settlement Agreement. I discuss the circumstances of this threat *infra* at 163–66. My initial discussion of the Settlement Agreement assumes that defendants Union Bank of Switzerland and Credit Suisse will act responsibly and adhere to the modifications. If they do not, then, for reasons that I will explain, I will approve the Settlement Agreement without the modifications.

### *Discussion*

"The central question raised by the proposed settlement of a class action is whether the compromise is fair, reasonable and adequate." *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982). This determination involves consideration of both the process by which the settlement was reached and the substantive terms of the settlement itself. *Id.* at 73–74. I have considered both the procedural fairness of the settlement process, and the overall adequacy and reasonableness of the substantive terms of the proposed settlement, and find that each of these components weighs in favor of final approval.

### I. *Procedural Fairness*

I turn first to the procedural component of the fairness determination. This consideration focuses on the "negotiating process by which the settlement was reached." *Weinberger,* 698 F.2d at 73. The process must be examined "in light of the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred

the negotiations themselves." *Malchman v. Davis,* 706 F.2d 426, 433 (2d Cir.1983). In particular, a judge ruling on the fairness of a settlement has a fiduciary duty to ensure that the settlement is not the product of collusion. *See In re Warner Communications Securities Litigation,* 798 F.2d 35, 37 (2d Cir.1986). "So long as the integrity of the arm's length negotiation process is preserved, however, a strong initial presumption of fairness attaches to the proposed settlement." *In re NASDAQ Market–Makers Antitrust Litigation,* 187 F.R.D. 465, 474 (S.D.N.Y.1998).

■ In a class action, the principal impediment to assuring an untainted settlement process is the financial interest of counsel, who may be improperly influenced to accept certain settlement terms, or to accept a settlement at all, thereby "subordinat[ing] the interests of class members to the attorney's own economic self-interest." John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation,* 100 Colum. L.Rev. 370, 371–72 (2000). As plaintiffs' lead counsel observes, however, such a "divided loyalty" structural concern is absent from this case. Neuborne Decl. I ¶ 28. Key members of the plaintiffs' Executive Committee who negotiated this settlement are providing their services on a *pro bono* basis, at most requesting that, in lieu of attorneys' fees, payments be made to law schools to endow Holocaust Remembrance Chairs in honor of class members who did not survive, and to foster international human rights law designed to prevent similar human tragedies in the future. *Id.* Numerous lawyers, including plaintiffs' lead settlement counsel, have waived all attorneys' fees. Those relatively few members of the plaintiffs' Executive Committee who are seeking fees personally have agreed to limit their fee applications to the traditional "civil rights" standard of lodestar for time actually expended that materially advances the litigation, and all fees are capped at no more than 1.8% of the settlement fund, with discretion to award a lower sum. *Id.*

Moreover, based upon my extensive personal involvement in the process, I know that the compromise was reached as the result of lengthy, well-informed and arm's-length negotiations by competent and dedicated counsel who provided loyal and effective legal representation to all parties. Counsel for the plaintiff settlement classes are experienced plaintiffs' advocates and class action lawyers. One could not assemble a more capable group. Among the lawyers for the plaintiffs who are serving without fee are Professor Burt Neuborne of New York University Law School, a brilliant scholar and advocate, who developed the class's legal theories and who presented legal argument on behalf of plaintiffs, and Melvyn H. Weiss and Michael D. Hausfeld, leading members of the class action bar, who ably led plaintiffs' negotiating team. While I have independently evaluated the fairness of the settlement, the unanimous support of this group in favor of final approval is entitled to great weight. *See NASDAQ,* 187 F.R.D. at 474 (where court is satisfied that negotiations were conducted at arm's length and in good faith, " 'great weight' is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation" (citation omitted)).

## II. *Substantive Fairness*

■ I now turn to the substantive component of the fairness determination. This consideration generally is evaluated by reference to the list of specific factors identified in *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974). These factors, all or some of which may be relevant, depending on the case, include

(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the

risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Id.* (internal citations omitted). While I do not consider each of these factors in the order in which they are set forth in *Grinnell,* I address a number of them in the following discussion. The remaining factors, to the extent they are relevant to this case, are addressed in the context of my discussion of the various objections and comments raised concerning the Settlement Agreement. *See infra* § III. The *Grinnell* factors weigh heavily in favor of a finding of substantive fairness.

■ I begin by noting that, as of May 8, 2000, some . 550,000 Initial Questionnaires had been received from class members worldwide, Settlement Class Counsel's Update on Notice Administration (June 15, 2000) ¶ 4, suggesting a widespread interest in participation in the settlement. Approximately 32,000 letters had been received, only approximately 243 of which commented upon or objected to the settlement, and approximately 448 of which contained comments on the plan of allocation or the claims process. *Id.* ¶¶ 5–6. Approximately 401 opt-out requests had been received, a few of which have since been withdrawn, and a percentage of which were from persons who are not class members or who simply did not understand the purpose or nature of the request. *Id.* ¶ 8. Correspondence is still being received by the notice administrators, consisting almost exclusively of Initial Questionnaires and comments on the allocation and distribution of settlement funds.

The above figures help demonstrate that the response of the classes has been overwhelmingly positive, as the vast majority of class members responding to the notice are interested in participating in the settlement, and only a tiny fraction of class members has expressed dissatisfaction with its terms. In addition to the positive response of class members themselves, there is virtually unanimous worldwide support for the settlement from Jewish and Holocaust survivors' organizations, many of whom have executed written endorsements of the settlement. They include the Agudath Israel World Organization, Alliance Israelite Universelle, the American Gathering/Federation of Jewish Holocaust Survivors, the American Jewish Committee, the American Jewish Congress, the American Jewish Joint Distribution Committee, the Anti–Defamation League, B'nai B'rith International, the Centre of Organizations of Holocaust Survivors in Israel, the Conference on Jewish Material Claims Against Germany, the Council of Jews from Germany, the European Council of Jewish Communities, the Holocaust Educational Trust, the Jewish Agency for Israel, the Simon Wiesenthal Center, the World Jewish Congress and the World Zionist Organization. In addition to those groups that have expressly endorsed the settlement, various others, including the Jehovah's Witnesses, Disability Rights Advocates, the International Gay and Lesbian Association and several groups representing the interests of the Romani (as well as the Sinti, who are a subgroup of the Romani) have implicitly endorsed the settlement by submitting proposals for the allocation and distribution of the settlement funds. Indeed, Roman Kwaitkowski, who is the president of the Polish Association of Roma, appeared at the fairness hearing to express his appreciation for the fact that "this time, nobody forgot about us." Transcript of Fairness Hearing, November 29, 1999, at 144–45.

Former United States Senator Alfonse D'Amato, who participated in the settlement negotiations as an advocate for Holocaust victims, also has concluded that the settlement is eminently fair and brings closure to the questions raised about the

role of Switzerland during World War II. Similarly, New York City Comptroller Alan Hevesi, who led a group of state and local public finance officials that monitored the negotiations between the parties, has publicly stated that the settlement is fully fair, reasonable and adequate.

The United States, which participated actively in settlement discussions over a period of many months, through Deputy Treasury Secretary Eizenstat, has expressed its "unqualified support for the parties' class action settlement" and endorsed it "as fair, reasonable and adequate and unquestionably in the public interest." Transcript of Fairness Hearing (Nov. 29, 1999) at 27 (comments of James Gilligan, U.S. Department of Justice, on behalf of the United States). Mr. Gilligan continued as follows:

> The United States supports approval of the settlement the parties have reached. It is fair and just and promotes the public interest, as expressed in the policy that the United States government has pursued for the past four years. Because the parties reached for common ground rather than prolong their difference[s], the elderly victims of the Holocaust will receive the benefits of this settlement in their lifetime and much more quickly than would have been possible had the litigation continued.
>
> But of equal importance, the United States regards this settlement as an excellent example of how cooperation and the will to fulfil[l] a moral obligation can lead to voluntary resolution of disputes over Holocaust-era claims.
>
> The government anticipates that the settlement here, by force of its example, will promote the U.S. policy of negotiated settlement in other cases and countries where Holocaust victims' claims for restitution have not yet been resolved. In particular, the United States is hopeful that this settlement will add a sense of urgency and possibility to resolving the pending class action claims of slave

and forced laborers who can no longer wait for years for justice to be done. *Id.* at 31–32. Mr. Gilligan's prediction that the present settlement would serve as a catalyst for a negotiated agreement of the claims of slave and forced laborers has proven accurate. On March 23, 2000, a final agreement was reached concerning the allocation of an even more substantial settlement fund—approximately $5 billion—in a related litigation on behalf of victims of Nazi slave and forced labor policies, some of whom are also members of the slave labor classes here.

I note that the adequacy and reasonableness of the settlement must be measured against the practical alternative to the settlement in the real world. The alternative to this settlement was prolonged, complex and difficult litigation, in which plaintiffs' chance of success as a class was uncertain. The age and health of many of the class members also presses for a prompt resolution. Because of the passage of time, the destruction of records, and the death of most of the percipient witnesses, the potential amount of damages plaintiffs might have recovered, even if they had been able to prevail in litigation, would have been extremely difficult to calculate with precision.

Defendants raised substantial questions regarding plaintiffs' ability to state claims under either international or state law, at least with respect to some of the claims. Significant and non-frivolous questions were also raised by defendants in their motions to dismiss, including questions regarding the justiciability of some of plaintiffs' claims. Such concerns have resulted in the dismissal of Holocaust-era claims in two recent cases decided in New Jersey. *See Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999); *Burger–Fischer v. DeGussa AG,* 65 F.Supp.2d 248 (D.N.J.1999). I take no position regarding whether these cases were correctly decided, or whether they would even apply here. Instead, I cite them as a reality check for those objectors who believe that

strong moral claims are easily converted into successful legal causes of action. Judge Kram stated it well in her opinion in *In re Austrian and German Bank Holocaust Litigation*, 80 F.Supp.2d 164, 177 (S.D.N.Y.2000), in which she observed:

> It goes without saying that the events which form the backdrop of this case make up one of the darkest periods of man's modern history. Those persecuted by the Nazis were the victims of unspeakable acts of inhumanity. At the same time, however, it must be understood that the law is a tool of limited capacity. Not every wrong, even the worst, is cognizable as a legal claim. Indeed, a number of obstacles stand in the path of plaintiffs' claims in this case.

These words apply with equal force here.

In accepting both the $1.25 billion settlement figure and the defendant banks' demand for broad releases as a fair and reasonable settlement of this class action, plaintiffs' counsel took cognizance of these considerations and balanced the powerful legal and moral claims of the members of the plaintiff classes against (i) the defendant banks' vigorous defense of this action, including the prospect of extensive appellate delays before any judgment could be enforced; (ii) the intransigence of the government of Switzerland and the Swiss National Bank in refusing to contribute to the settlement fund, and in interposing obstacles to the effective prosecution of plaintiffs' legal claims; (iii) the litigation uncertainties surrounding plaintiffs' claims against the defendant banks, especially the difficulty in gaining access to the Swiss banking records needed to establish plaintiffs' claims; (iv) the need for speedy distribution of funds to aged victims, many of whom are in great distress; and (v) the substantial legal and factual uncertainties that would have complicated effective pursuit of legal claims against the Swiss Na-

tional Bank, the Swiss government and the remaining non-party releasees. Neuborne Decl. I ¶ 6. They came to the conclusion that while, in a perfectly just world, plaintiffs should have received a far greater sum, in the real world, a recovery of $1.25 billion in return for broad releases was the best that dedicated and competent counsel could achieve under the circumstances of this case. *Id.* I agree.[1]

### III. *Objections and Comments*

I have considered all of the objections and comments expressed by settlement class members and others at the fairness hearings and through independent submissions to the court. In addition, because I participated extensively in the settlement negotiation process, I am intimately familiar with the competing interests of, and concerns that have been expressed by, persons with an interest in the subject matter of this litigation. These objections and comments do not warrant denial of the motion for final approval.

### A. *Deferring Notice of the Proposed Plan of Allocation and Distribution Until After Final Approval of the Settlement Agreement*

The Settlement Agreement provides for the appointment of a Special Master "to develop a proposed plan of allocation and distribution of the Settlement Fund, employing open and equitable procedures to ensure fair consideration of all proposals for allocation and distribution." Settlement Agreement ¶ 7.1. Under the Settlement Agreement, the Special Master, as a neutral third party, is to consider all suggestions regarding allocation and distribution directly from the class, without relying upon intermediating representatives, such as settlement class counsel or settlement class representatives. The Special

---

1. I do not and need not "decide the merits of the case or resolve [the] unsettled legal questions" it presents. *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998–99 n. 14, 67 L.Ed.2d 59 (1981). Instead, I need only "weigh the likelihood of success by the plaintiff class against the relief offered by the Settlement Agreement[ ]." *Marisol A. v. Giuliani*, 185 F.R.D. 152, 164 (S.D.N.Y.1999).

Master will then take that direct input and present a draft plan. That plan will be publicized, and class members will have an opportunity to communicate directly with me regarding it, again, without any intermediaries to dilute the class members' direct influence. Their comments will be addressed and/or incorporated in a final plan. I have appointed Judah Gribetz, Esq., as Special Master in this case.

Mr. Gribetz is an extraordinarily able lawyer with a long record of distinguished public service. He has served as Counsel to the Governor of the State of New York and as Deputy Mayor of the City of New York. He has contributed his time and energy to charitable and community organizations too numerous to recite. Most importantly, he has a deep understanding of all issues related to the Holocaust. He is a member of the Board of the Museum of Jewish Heritage—A Living Memorial to the Holocaust, which is located in New York. He is also the author of *The Timetables of Jewish History* (1993). In addition to working on the plan of allocation and distribution, he has been a wise counsel who has educated me about many of the critical issues relating to the formulation of a meaningful plan of allocation and distribution.

The appointment of a Special Master here also obviates the concern that hypothetical conflicts among class members relating to allocation and distribution would require separate representation, and thus call into question the adequacy of representation. This is so because the class members *represent themselves* on this key issue, and have direct access to the Special Master and to me. The adequacy concerns that informed the Supreme Court's decisions in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), are therefore absent from this case. The Special Master will file the proposed plan of allocation and distribution not later than 30 days from the date of the entry of the final judgment approving the settlement.

At the fairness hearings, however, several persons criticized the decision to hold any fairness hearing prior to receiving notice of the specific amounts they were likely to recover. I agree that, ordinarily, it is preferable to provide specific information to class members concerning their likely recovery prior to the fairness hearing in order to permit criticism and challenge, if appropriate. However, the special circumstances of this litigation, involving five worldwide settlement classes arising out of events that transpired approximately 60 years ago, make it virtually impossible to provide specific information to individuals about their precise recovery prior to the completion of the elaborate claims processes contemplated by the Settlement Agreement, and under consideration by the Special Master. The implementation of such an elaborate and expensive set of claims processes would be impossible in the absence of a threshold judicial finding that the basic Settlement Agreement, including the gross settlement amount and the procedures for allocating and distributing specific amounts to class members, is fair, reasonable and adequate. Thus, it was physically impossible to provide class members with specific information concerning their individual recoveries at this stage of the proceedings.

To compensate for this inability, counsel provided elaborate notice of the procedures that were to be used to reach the point where specific amounts would be payable, and asked the class to pre-commit to those procedures in lieu of considering a specific amount at this stage of the proceedings. In particular, the unique circumstances of this complex litigation require *both* a fairness hearing on the terms of the basic settlement, and a subsequent opportunity to comment on the Special Master's recommended plan of allocation and distribution. Thus, the parties have contemplated that, once I have approved the basic fairness of the settlement and its

attendant procedures, the Special Master will promptly issue his recommendations concerning allocation and distribution and those recommendations will be transmitted for comment and criticism to the members of the plaintiff classes. Only after I approve the plan of allocation and distribution will a claims process capable of generating specific figures be possible.

Significantly, as the Second Circuit has recognized,

> [t]he formulation of the [distribution] plan in a case such as this is a difficult, time-consuming process. To impose an absolute requirement that a hearing on the fairness of a settlement follow adoption of a distribution plan would immensely complicate settlement negotiations and might so overburden the parties and the district court as to prevent either task from being accomplished.

*In re "Agent Orange" Product Liability Litigation,* 818 F.2d 145, 170 (2d Cir.1987) (Winter, J.); *see also NASDAQ,* 187 F.R.D. at 480 ("it is appropriate, and often prudent, in massive class actions to follow a two-stage procedure, deferring the Plan of Allocation until after final settlement approval"); *MCL 3d* § 30.212 ("Often the details of allocation and distribution are not established until after the settlement is approved"). Moreover, all class members have been informed of this process, and either had the opportunity to participate in it as a fair, transparent and open process for the determination of allocation issues, or had the opportunity to object or exclude themselves. The class overwhelmingly has endorsed such an approach. Under these circumstances, I reject the objection to the bifurcated process contemplated by the Settlement Agreement.

### B. *The Volcker Report*

These suits were filed two years after the World Jewish Restitution Organization had initiated discussions regarding certain restitution issues. Such negotiations led to, among other things, the creation of the Independent Committee of Eminent Persons (the "ICEP"). The ICEP, chaired by Paul A. Volcker (and also referred to hereafter as the "Volcker Committee"), was established in May 1996 by the Swiss Bankers Association, the World Jewish Congress and other Jewish organizations to conduct an audit of the settling defendants and other Swiss banks to identify accounts from the World War II era that could possibly belong to victims of Nazi persecution. The Volcker Committee conducted what is likely the most extensive audit in history, employing five of the largest accounting firms in the world at a cost of hundreds of millions of dollars to defendants. At the conclusion of its investigation, the Volcker Committee prepared a formal 100–plus page report, which it released on December 6, 1999 (the "Volcker Report"), setting forth its findings in detail, which included the revelation that approximately 54,000 Swiss bank accounts appear to have a "probable" or "possible" connection to a Holocaust victim. On February 23, 2000, the Volcker Committee announced that a review of the approximately 54,000 accounts identified as "probably" or "possibly" related to victims of Nazi persecution resulted in the elimination of certain accounts because they were duplicates or because of other technical factors, reducing the total number of such accounts to between 45,000 and 50,000. *See* Volcker Committee Press Release (Feb. 23, 2000). The Volcker Committee also announced that it had identified additional accounts that should be included among those "probable" accounts recommended for publication, increasing the total number of publishable accounts from approximately 25,000 to more than 26,000. *Id.* Nevertheless, for the sake of convenience, I use the initial Volcker Committee numbers throughout.

The parties reached an informal agreement to settle this case for $1.25 billion in August 1998, with knowledge that the Volcker Committee's investigation was ongoing and not likely to be completed for

some time. The parties felt that it was appropriate to proceed without waiting, not only because of the reasonableness of the settlement, but because an early agreement set in motion many of the procedural hurdles that had to be overcome in order for the settlement process to reach its current stage of final approval for fairness. These included the further negotiation and formalization of the informal settlement into the Settlement Agreement as originally executed; the preparation and dissemination of class notice; the conduct of the fairness hearings; and the negotiation of amendments to the Settlement Agreement to address valid objections raised at the fairness hearings. If this entire process had been delayed pending the results of the Volcker Report, which was not released until December 1999, the plaintiff class members would now be almost two years further removed from receiving distributions under the Settlement Agreement.

Several persons, however, voiced concern at the fairness hearings that the adequacy of the $1.25 billion settlement should be re-evaluated in light of the Volcker Report's identification of the approximately 54,000 Swiss bank accounts that are "probably" or "possibly" connected to Holocaust victims. While understandable, these objections do not justify upsetting the settlement.

Prior to the issuance of the Volcker Report, plaintiffs' counsel had asserted that, if the case were to proceed to trial, and if they were granted adequate discovery, they would be in a position to demonstrate the existence of large numbers of bank accounts in Swiss banks with a connection to Holocaust survivors. In fact, in conducting the negotiations that culminated in the $1.25 billion Settlement Agreement, plaintiffs' negotiating team utilized figures derived from an economic analysis of the flow of funds into Switzerland during the relevant period that were extremely close to the figures that were eventually suggested by the Volcker Report. Decla-

ration of Burt Neuborne (June 26, 2000) ("Neuborne Decl. II") ¶ 8. While the flow of funds figures were considerably higher than $1.25 billion, when discounted for the risks of litigation, the need for expeditious action and the necessarily imprecise nature of the economic analysis itself, the figures utilized by counsel in conducting the actual negotiations were roughly comparable to the figures derived from the Volcker Report. *Id.* Thus, the findings of the Volcker Report confirmed, rather than undermined, an important element of class counsel's expectations concerning plaintiffs' potential recovery in this case, and which class counsel had in mind when agreeing upon the settlement amount.

Moreover, the Volcker Report's identification of approximately 54,000 accounts with a "probable" or "possible" relation to Holocaust victims would not necessarily have been sufficient to establish a particular account holder's claim in the event this case had proceeded to trial. In order to prevail on most types of civil claims in an American forum, a plaintiff must demonstrate, at the very least, an entitlement to relief by a preponderance of the evidence—*i.e.*, that it is more likely than not that he or she is entitled to recover. Specifically addressing the issue of the difference between the criteria it employed and those that would be applied in a judicial proceeding, the Volcker Committee observed that

> [t]he determination of the probability or possibility of a relationship [of an account] to victims of Nazi persecution has been guided by certain strong presumptions about account characteristics, including name matches [with Holocaust victims]. However, *the precision of proof of such relationships normally applicable in judicial proceedings will rather typically depend upon evidence that is rarely still available after more than half a century.*

Volcker Report ¶ 69 (emphasis added). Indeed, the Volcker Committee recommended that "any claims resolution pro-

cess must take this reality into account." *Id.*

The absence of evidence necessary to meet "the precision of proof ... normally applicable in judicial proceedings" is due to the destruction of records of the Swiss banks, and there may have been an arguable legal basis for drawing an adverse inference against the banks had the case been litigated. *See, e.g., Reilly v. Natwest Markets Group, Inc.*, 181 F.3d 253, 266–68 (2d Cir.1999); *Kronisch v. United States,* 150 F.3d 112, 126–28 (2d Cir.1998). Nevertheless, the practical and legal problems resulting from the destruction of evidence and the passage of time counsel against litigating these claims. Indeed, a claims resolution process applying rules for recovery less rigorous than a legal proceeding could result in the payment of more claims than would otherwise be possible. *See* Declaration of Stuart E. Eizenstat (Nov. 23, 1999) ¶ 2 ("the number of victims who would be covered by some sort of negotiated settlement is often greater than can be achieved through litigation").

I note finally that the Volcker Committee came to the following conclusion with respect to the adequacy of the $1.25 billion settlement amount:

> [T]he investigation was not and could not be complete in the sense of reconstructing all accounts in Swiss banks in 1945. Had that been possible, additional victim accounts would be identified, and some victim accounts may have been missing among the 4.1 million identified accounts. In reviewing and balancing all these considerations, the Committee believes that claims of victims can be met within the amount specified in the [Settlement Agreement in this case], with funds from that settlement available for distribution to others covered by the settlement.

Volcker Report Annex 4 ¶ 43. Nevertheless, even if the claims resolution process reveals that the $1.25 billion settlement amount is insufficient to cover the aggregate value of these accounts, the potential shortfall must be weighed against the alternative. Even if plaintiffs were able to withstand dispositive motions and proceed through trial to a favorable judgment, the attendant appeals and other well-recognized delays of litigation could postpone indefinitely justice to the class members. Under these circumstances, a speedy settlement for a reasonable sum is far preferable to continued litigation, even in light of the revelations in the Volcker Report.

\* \* \*

There is one final observation regarding the Volcker Report of which cognizance should be taken. In his initial declaration in support of the motion to approve the Settlement Agreement, Professor Neuborne observed that,

> since certain persons may be tempted to mischaracterize legitimate settlement payments as a form of blackmail, a District Judge conducting a Rule 23(e) hearing should briefly assess the merits of plaintiffs' claims to assure that the Rule 23 process is not being abused, and to prevent public misperception that the judicial process is being improperly utilized as a tool of extortion.

Neuborne Decl. I ¶ 8. The significance of the report of the Volcker Committee, which included three members appointed by the Swiss Bankers Association, is that it provided legal and moral legitimacy to the claims asserted here on behalf of the members of the Deposited Assets Class. The findings suggest that the value of deposited assets held by the Swiss banks could exceed the $1.25 billion settlement amount. *See* Volcker Report Annex 4 ¶¶ 41–42 & n. 23.[2] Indeed, it is only the

---

2. This portion of the Volcker Report estimated the present value of certain categories of accounts, in Swiss francs, which it derived from mean and median values of known accounts. In concluding that the total value of accounts appears to exceed $1.25 billion, I have converted the Volcker Committee's figures (derived from the mean value of known accounts) to U.S. dollars using the currency exchange rate in effect at the close of trading

successful campaign that the Swiss banks waged to prevent disclosure before records were destroyed, Volcker Report ¶¶ 41(b), 48, that gave rise to the legal and practical impediments to the successful litigation of this case by the vast majority of individuals to whom money is justly due.

### C. *Administration of the Deposited Assets Class*

The Deposited Assets Class consists of victims of Nazi persecution who have claims against any Releasee "relating to or arising in any way from Deposited Assets or any effort to recover Deposited Assets." Settlement Agreement ¶ 8.2(a). A fair and efficient claims process in connection with the Deposited Assets Class must build on the fact that the Volcker Committee's auditors, despite the massive destruction of relevant records over the past 60 years, were able to identify the approximately 54,000 Swiss bank accounts discussed above. As Professor Neuborne observes, in order to continue the work of the Volcker Committee, it will be necessary to establish a deposited assets claims process designed to (i) notify potential claimants of the existence of the 54,000 accounts referred to in the Volcker Report; (ii) determine whether the original owners of such accounts are or were targets or victims of Nazi persecution, as defined in the Settlement Agreement; (iii) ascertain their heirs, if necessary; (iv) determine the amounts attributable to each account; (v) explore the circumstances surrounding the closing of certain of the accounts; and (vi) distribute the appropriate amounts to the current owners. Neuborne Decl. II ¶ 19. Moreover, aside from providing a mechanism to address claims related to the 54,-000 "probable" or "possible" accounts, a fair claims process must provide a mechanism to enable any person with a potential claim to have names matched against the

database of 4.1 million accounts for which records exist. Volcker Report ¶ 76.

The instrumentality for the administration of the claims process contemplated by the Settlement Agreement is the Claims Resolution Tribunal established by the Swiss Bankers Association, the Swiss Federal Banking Commission and the Volcker Committee to arbitrate claims arising from the 1997 publication of 5,570 foreign accounts in Swiss Banks. Modifications in procedures and personnel will be required and the Claims Resolution Tribunal will operate under guidelines and criteria established with my approval, in consultation with the Volcker Committee. *See* Settlement Agreement ¶ 4.1 ("[T]he parties anticipate that the ICEP and the Claims Resolution Tribunal will continue, at certain Releasees' expense, in a manner that is appropriate in light of this Settlement Agreement").

The purpose of the Claims Resolution Tribunal is to administer a fair and efficient claims process. This process includes, among other things, assuring

that any person with a valid claim to a dormant account of a victim of Nazi persecution, whether or not an account name is published, should be provided facilities for submitting such a claim. Claims already submitted to ICEP, new claims submitted to the [Claims Resolution] Tribunal directly, claims filed with the Class Action Settlement, and claims from the New York State Holocaust Claims Processing Office should be matched against the available databases of accounts. If there are matches of such claimants on these lists with the full list of names of account holders, a claims resolution process should be initiated by the Claims Resolution Tribunal. In principle, the [ICEP] believes that all victims of Nazi persecution or their heirs who submit a claim should be able

last week. While the total estimated value of accounts derived from the median value of known accounts, as opposed to the mean value, is less than $1.25 billion, both the mean

and median figures may significantly understate the account values for reasons that need not be detailed here.

to have such a claim resolved if the account holder's name is indeed found in the accounts database by the Claims Resolution Tribunal.

Volcker Report ¶ 76. So that the claims resolution process would function efficiently, the Volcker Committee recommended the publication of 25,187 of the 54,000 accounts, which are "probably" related to a Holocaust victim, *id.* ¶ 74; it recommended the process by which names could be matched to information in a centralized database, *id.* ¶ 76; and it recommended the creation of a central database of all 4.1 million accounts opened in Switzerland between 1933–45. *Id.* ¶ 67.

Some background is necessary to understand the significance of the latter recommendation. There were approximately 6,858,116 accounts that were opened in Swiss banks between 1933–45. Of these, no records existed for approximately 2,757,950 accounts, "an unfillable gap ... that can now never be known or analyzed for their relationship to victims of Nazi persecution." Volcker Report Annex 4 ¶ 5. Of the remaining approximately 4.1 million accounts, the Volcker Committee used its key methodology of matching the names of account holders against the names of victims of Nazi persecution to only approximately 2.25 million accounts. The matching process was not applied to 1,065,630 domestic Swiss accounts and 784,791 small savings accounts. Volcker Report Annex 4 at 59–60. The bottom line of this is that the 54,000 matched accounts that were identified as "probably" or "possibly" belonging to victims of Nazi persecution is based on an audit of approximately one-third of the accounts opened in Switzerland during the relevant period. Consequently, as the Volcker Committee observed, "the total of the number and value of accounts with some presumption of involvement with victims of Nazi persecution identified by the investigation is clearly conservative." Volcker Report ¶ 58.

More specifically, Chairman Volcker has stated that "there will be some limited but significant number of Holocaust related accounts to be found among the millions of savings and Swiss address accounts that we arbitrarily excluded from our research." Letter of Chairman Volcker to Swiss Federal Banking Commission Chairman K. Hauri (Apr. 12, 2000) at 2. This is in part because many victims of Nazi terror may have opened Swiss bank accounts using a secondary residence address in Switzerland, or a false Swiss address designed to confuse the Nazis, or the Swiss address of a friend, business associate or lawyer. Chairman Volcker made this point in explaining language in the Volcker Report, *see* Volcker Report Annex 4 ¶ 8, which suggested that domestic Swiss accounts and small savings accounts were not relevant to its investigation:

> These convenient shorthand descriptions [ (*i.e.,* "relevant" or "irrelevant" accounts and "probable" or "possible" relationships to Holocaust victims)], perhaps too cryptic in light of lawyers determination to split hairs, cannot contradict the uncontestable fact that the exclusion of millions of small savings accounts and Swiss address accounts from the ICEP analysis in the interest of speedy and manageable results does not, and cannot, mean that none of those accounts were Holocaust related. To the extent that such accounts can be practically and expeditiously identified, which is what the test experiment suggests is entirely feasible, the effort should be done to put this matter to rest.

Volcker Letter at 3. This, he explained, was the reason for the need to create a central database of 4.1 million accounts, including the Swiss address and small bank accounts.

On March 30, 2000, after an inordinately long and unexplained delay of four months following the publication of the Volcker Report, the Swiss Federal Banking Commission ("SFBC") authorized publication of relevant information relating to approximately 26,000 of the accounts referred to in the Volcker Report that were identified

as having a "probable" link to Holocaust victims. Neuborne Decl. II ¶ 21 & Ex. 7. No authorization was given by the SFBC for the publication of information relating to the approximately 28,000 remaining accounts identified in the Volcker Report as "possibly" related to Holocaust victims. Moreover, unlike earlier SFBC rulings concerning publication of information relevant to Holocaust-related accounts, the SFBC merely "authorized" publication of much of the relevant information, but did not mandate complete publication. Perhaps even more disturbing was the failure of the SFBC to mandate the creation of a central database of 4.1 million accounts that were opened in Switzerland between 1933–45. In sum, the SFBC, by its actions, has made it much more difficult to carry out the mandate of the Volcker Committee that "victims who have been long denied justice by circumstances beyond their control—often poor and now aged— deserve every reasonable assistance in establishing a claim." Volcker Report ¶ 70.

The failure of the SFBC to implement fully the recommendations of the Volcker Committee raised serious questions over whether it would be possible to administer a fair claims process in connection with the Deposited Assets Class. This is because access would be denied to information necessary (i) to provide notice to all potential claimants of the existence of bank accounts with a "probable" or "possible" connection to Holocaust victims, (ii) to permit victims of Nazi persecution to have names matched against the database of 4.1 million accounts for which records exist and (iii) to permit a deposited assets claims resolution process to operate fairly, efficiently and in accordance with procedural due process of law.

Professor Neuborne advises me that the defendant banks, acting pursuant to the SFBC's authorization, have agreed to cooperate in assembling information concerning their portion of the 26,000 "probable" accounts referred to in the SFBC's March

30 order in order to permit expeditious publication of names and other identifying information associated with those accounts after approval of a final plan of allocation and distribution. Neuborne Decl. II ¶ 22. The defendant banks also have agreed to cooperate in achieving an earlier publication date if approval of the allocation and distribution plan encounters substantial delays, if it is possible to assemble the information needed for publication prior to such approval and if an adequate court-approved claims process is in place to assist claimants. *Id.*

I am also informed that the defendant banks, acting pursuant to SFBC authorization, have agreed to create a centralized electronic database relating to their share of the 54,000 accounts referred to in the Volcker Report. Neuborne Decl. II ¶ 26. They have also agreed to permit the personnel of the Claims Resolution Tribunal established under the Settlement Agreement to have convenient access to the centralized database of the 54,000 accounts and to the Volcker Committee's auditors' paper files in connection with such accounts. *Id.* The defendant banks' cooperation also will be geared towards assisting in the matching of claims to accounts that claims personnel have a reasoned and satisfactory basis for concluding may be listed under a Swiss address (including accounts opened in the names of intermediaries) against existing bank databases containing 2.1 million accounts opened during the relevant period. *Id.* ¶ 27. These databases include the Swiss address accounts opened in those banks. In addition, the defendant banks have represented that "they will consider in a spirit of cooperation requests for further assistance in any particular cases where there is a reasonably strong likelihood that further assistance would provide probative information and where the costs of such further assistance do not outweigh the potential benefits." Memorandum to File of Burt Neuborne, Esq.

and Roger Witten, Esq. (undated) ¶ B(3).[3]

Nevertheless, the failure of the SFBC to mandate compliance with the recommendations of the Volcker Committee, coupled with the unwillingness of the private or cantonal banks that are non-party releasees to voluntarily cooperate in permitting publication of information relating to some or all of their accounts that may be included within the 54,000 accounts referred to in the Volcker Report, have created substantial impediments to administration. The refusal of the cantonal and private banks to permit such publication is estimated to affect between 200–250 of the 26,000 accounts that are "probably" related to Holocaust victims and the names of which were authorized for publication by the SFBC. Neuborne Decl. II ¶ 23. This will make it impossible to notify class members of the existence of these accounts. The failure of the cantonal and private banks to cooperate also will seriously impede the ability of the claims process to carry out the Settlement Agreement with respect to as many as 3,500 of the 20,000 remaining accounts in these non-party banks that the Volcker Report identified as being "possibly" related to Holocaust victims. *Id.* ¶ 28. Nor will the private and cantonal banks permit voluntary access to their records to match possible Swiss address accounts. *Id.*

The unwillingness of the SFBC to mandate compliance with the recommendations of the Volcker Committee is inexplicable, and the failure of the private and cantonal banks to voluntarily comply is inconsistent with the spirit of the Settlement Agreement, which recites that "Settling Plaintiffs and Settling Defendants commit to support and urge the conclusion of the mandates of the Volcker Committee." It also amounts to nothing less than a replay of the conduct that created the problems addressed in this case. I refer here in particular to the unanimous findings of the Volcker Committee, which included three members appointed by the Swiss Bankers Association. While its auditors "reported no evidence of systematic destruction of records of victim accounts, organized discrimination against the accounts of victims of Nazi persecution, or concerted efforts to divert the funds of victims of Nazi persecution to improper purposes," Volcker Report ¶ 41(a) (internal footnote omitted), the Volcker Committee nonetheless

> confirmed evidence of questionable and deceitful actions by some individual banks in the handling of accounts of victims, including withholding of information from Holocaust victims or their heirs about their accounts, inappropriate closing of accounts, failure to keep adequate records, many cases of insensitivity to the efforts of victims or heirs of victims to claim dormant or closed accounts, and a general lack of diligence—even active resistance—in response to earlier private and official inquiries about dormant accounts.

*Id.* ¶ 41(b) (internal footnote omitted). More significantly, the Volcker Committee unanimously found that

> [t]he Swiss commitment to bank secrecy and a concern about maintaining the integrity of that secrecy—ironically in part a response to foreign exchange controls in Germany and their use to persecute Jews there—were undoubtedly factors in the decision not to publish the names of the dormant account holders after World War II. Switzerland had an informed and vigorous debate extending over a number of years on this subject. Banks were also concerned that too liberal a regime for processing claims to dormant accounts would result in payments to the wrong parties and double liability for the banks. *Unfortunately, the banks and their Association lobbied against legislation that would have required publication of the names of such so called "heirless assets accounts," legislation that if enacted and implemented, would have obviated the ICEP inves-*

3. This memorandum to file will be docketed with the Clerk of the Court.

*tigation and the controversy of the last 30 years. An historic opportunity was missed.*

*Id.* ¶ 48 (emphasis added).

It is disturbing, to say the least, that, having participated in creating the problem that the Volcker Committee was attempting to address, the Swiss private and cantonal banks do not feel a moral obligation to the victims of Nazi persecution. Nevertheless, if they seek the benefit of releases under the Settlement Agreement, these banks cannot legally continue to conceal from the class information needed to take advantage of the benefits conferred by the Settlement Agreement. Requiring this minimal cooperation as a condition for a release does not deny any benefit that the Settlement Agreement confers. To the contrary, it grants the benefit of the Settlement Agreement subject to the releasees' compliance with the duty to act in good faith. *See Restatement (Second) of Contracts* § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement"); *see also Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228, 230 (2d Cir.1991) ("Under New York law, every contract contains an implied covenant of good faith and fair dealing").

This duty of good faith reflects the principle that one who seeks equitable relief, such as the specific performance of a contract, must behave equitably. *See, e.g., Overall v. Estate of L.H.P. Klotz,* 52 F.3d 398, 404 (2d Cir.1995) ("a person who seeks equity must do equity"). "[T]his vague single principle gets most of its qualities in a given group of cases from the substantive law of the particular subject. It is largely shaped by the human practices and public policies involved in the situation." Zechariah Chafee, Jr., *Coming Into Equity With Clean Hands,* 47 Mich. L.Rev. 877, 1092 (1949). The most apt statement of the applicable substantive law may be found in *Price v. Spielman Motor*

*Sales Co.,* 261 A.D. 626, 629, 26 N.Y.S.2d 836, 839 (2d Dep't 1941):

> Though a court balks at making a contract for the parties, it will, where justice and expediency demand, infuse the contract with a spirit of good faith and fair dealing in order to justify the implication of a covenant which will prevent one party from impairing the right of the other party to receive the fruits of the contract.

(Internal quotation marks omitted.) Applied here, this means that a party who seeks to enforce a contract for a release extinguishing the claims of a particular class cannot in good faith withhold from class members the information necessary in order to claim benefits to which they are entitled.

In sum, my hope is that the Swiss Confederation, if not the SFBC, will take the steps necessary to compel the cantonal and private banks to comply with the Volcker Committee's recommendations to the same extent as the defendant banks have agreed to comply. Nevertheless, their failure to do so does not justify disapproving the settlement with the defendant banks. They have pledged "their good faith cooperation with the implementation of the settlement." Memorandum to File of Burt Neuborne, Esq. and Roger Witten, Esq. (undated) ¶ A. This is a pledge that reflects their legal obligation. It is one to which I intend to hold them.

### D. *Looted Art*

At the fairness hearings, several objectors, most notably Anne Webber, speaking on behalf of the Commission for Looted Art in Europe, observed that the broad scope of the releases initially contemplated in connection with the Looted Assets Class might pose an obstacle to the recovery of artworks and other items of specific property looted by the Nazis and currently in the possession of a Swiss releasee. A careful reading of the Settlement Agreement alone should allay a part of these concerns. Specifically, under the Settle-

ment Agreement, the definition of "Releasees" includes governmental entities and business concerns; the definition does not cover private foundations, private museums or individual collectors. Settlement Agreement ¶ 1. This means that the Settlement Agreement does not impose any obstacle to the recovery of looted art from a significant group of potential collectors.

While the Settlement Agreement does preclude the recovery of looted art from Swiss businesses and governmental agencies, the legal and practical obstacles to the recovery of art from this group are already substantial, if not insurmountable. Unlike New York law, for example, Swiss law permits a purchaser in good faith to acquire valid title to stolen art. Swiss law also presumes that a purchaser acts in good faith, and a plaintiff seeking to reclaim stolen property has the burden of establishing that a purchaser did not act in good faith. *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.,* 717 F.Supp. 1374, 1400 (S.D.Ind.1989), *aff'd,* 917 F.2d 278 (7th Cir.1990). Indeed, Switzerland has been described as "a country to which buyers of stolen art flock in order to claim Swiss law's protection of buyers." Steven A. Bibas, *The Case Against Statutes of Limitations for Stolen Art,* 103 Yale L.J. 2437, 2449 (1994) (citing Stanley Meisler, *Art & Avarice,* L.A. Times, Nov. 12, 1989, Magazine, at 8, 10–11 (describing the facts that gave rise to the *Autocephalous* case)).

Under these circumstances, the releases granted under the Settlement Agreement added little to the protection already enjoyed by the releasees under Swiss law. In any event, the defendant banks have agreed to modify the original Settlement Agreement to assure that persons may seek judicial assistance in recovering looted artwork, rare books and other items of cultural provenance from releasees without any serious impediment created by the Settlement Agreement. Accordingly, while the amended releases contemplated by the amended Settlement Agreement would continue to bar damages actions, they would not bar actions in the nature of replevin designed to recover specific items of artwork, as long as the actions are brought in the country where the artwork is located, or from which it was looted.

Two specific aspects of the amended Settlement Agreement have drawn further criticism, however. First, critics appear troubled by provisions limiting litigation designed to recover specific works of art to the country where the art is located, or from where it was seized. The amended art releases would, however, permit litigation to recover art that is temporarily in the United States or on loan, or for exhibition. Since efforts in the United States to litigate concerning art that is physically located in another country might well be subject to transfer to that country under the doctrine of *forum non conveniens,* and would not likely be governed by our law even if not transferred, I reject the objection to the venue provisions concerning art in the amended agreement.

Second, critics have expressed concern over a requirement that individuals take "reasonable steps" to secure the return of artwork before commencing litigation. This is not an unusual requirement. Under New York law, for example, "[u]ntil demand and refusal, the purchaser in good faith is not considered a wrongdoer." *DeWeerth v. Baldinger,* 836 F.2d 103, 106 (2d Cir.1987). I do not understand the term "reasonable steps" to require any more than this.

Nevertheless, I agree with the objectors that the proposed amendments may be more symbolic than significant. The problem, however, is not the Settlement Agreement, but Swiss law, which likely would apply in any event, and the practical problems associated with locating looted art. *See* Letter of Anne Webber (Dec. 7, 1999) at 3 ("We cannot stress enough how very difficult it has been for claimants over the last 55 years just to locate their looted property, so artful has been the concealing of it by those in possession of it"). Under

these circumstances, it would simply be irresponsible to reject the Settlement Agreement because of the objections relating to looted art.

### E. *Insurance Releases*

The original Settlement Agreement provides for releases to a number of unidentified non-party Swiss insurance companies, defined broadly to include any insurance company where at least 25 percent of the outstanding stock is owned by a Swiss company. Several Swiss insurance companies against which litigation was pending in the federal courts were explicitly excluded from these releases.

In connection with the fairness hearings, I received several well-taken objections to the inclusion of insurers as "Releasees" under the Settlement Agreement. The objections related to the effectiveness of notice as to claims against released Swiss insurers and the appropriateness of releasing such insurers in the absence of a mechanism to pay valid Holocaust-related insurance claims as part of the distribution of the settlement fund.

In response to these objections, the parties and major Swiss insurers released under the Settlement Agreement, after extensive discussions, have agreed on a mechanism to evaluate and pay Holocaust-related insurance claims. The mechanism, set forth in Article 4 of Amendment 2 to the Settlement Agreement, specifically designates up to $100 million (including up to an additional $50 million provided by the insurers themselves) for the resolution of unpaid insurance claims. The mechanism provides for prompt and fair consideration of all insurance claims, appropriate multipliers for such claims, full cooperation of the participating insurers in providing relevant documentary material to potential claimants (subject to monitoring by the Swiss insurance supervisor) and assurance of payment from the settling defendants. The amendment also contains a provision that acknowledges my power to order participating insurers to disclose the holders of policies, with the consequence of an insurer's failure to comply being the exclusion of such insurer from all provisions of the Settlement Agreement. My power to order such disclosure is subject to the application of certain standards that are not inconsistent with the good faith duty of a releasee to make disclosures necessary to permit class beneficiaries to obtain the benefits of the Settlement Agreement. *See supra* at 158–59. The details of the insurance claims mechanism and the list of participating released insurers will be part of the notice of the proposed plan of allocation and distribution, and class members will have an opportunity to opt out of the insurance provisions of Amendment 2.

I find that the insurance provisions of Amendment 2 are fair and reasonable, and adequately address the concerns raised in the objections submitted in connection with the fairness hearings. Accordingly, they merit approval as part of the settlement. In reaching this decision, I have considered all of the relevant factors and circumstances, including the status of insurers as releasees under the Settlement Agreement, the addition of up to $50 million to the settlement amount and the unavailability of a superior mechanism for the payment of Holocaust-related claims involving such insurers. I have also relied upon the following representations by the participating insurance carriers: (i) the amount of unpaid "Policy Claims" under Amendment 2 is not likely to exceed $100 million in the aggregate (including multipliers) and (ii) most of the participating insurance carriers have reasonably complete surviving documentation that will permit them (and the settlement's insurance claims mechanism contemplated by Amendment 2) to provide fair and efficient consideration of all claims.

### F. *Administration of the Refugee Class*

The Refugee Class consists of victims of Nazi persecution "who sought entry into

Switzerland in whole or in part to avoid Nazi persecution and who . . . were denied entry into Switzerland or, after gaining entry, were deported, detained, abused, or otherwise mistreated." Settlement Agreement ¶ 8.2(e). The Special Master has expressed concerns over the ability to administer the Refugee Class in a fair and efficient manner in the absence of information concerning the identities of persons expelled from, or denied entry into, Switzerland during the relevant period. In the absence of such information, it will be extremely difficult to notify potential Refugee Class claimants of their rights, and to fairly administer a refugee claims process.

In December 1999, the Independent Commission of Experts—an independent group of internationally recognized historians chaired by Jean Francois Bergier that was established by the Swiss Confederation in 1996 to examine Switzerland's relationship with Nazi Germany (and referred to hereafter as the "Bergier Commission")—released a report (the "Bergier Report") indicating that approximately 14,-500 applications to gain entry into Switzerland were rejected by the Federal Foreign Police and that more than 24,000 refugees were turned back at the border or expelled during the war years. Bergier Report at 129; Letter of Prof. Dr. Christoph Graf to Judah Gribetz, Esq. (Mar. 31, 2000) at 2. On March 31, 2000, the Swiss Federal Council authorized the Swiss Federal Archives ("SFA") to release to the Special Master a list of persons denied entry into, or expelled from, Switzerland during the relevant period. Neuborne Decl. II ¶ 38. I acknowledge the good faith cooperation of the SFA in compiling this list. Unfortunately, however, SFA officials have informed the Special Master that it "will be possible to collect a small part of the names only," and that, "[a]t the moment, this list contains about 2,500" names. Memorandum of Judah Gribetz, Esq. (June 29, 2000) at 2. This is woefully inadequate. Nevertheless, the SFA further informed the Special Master that it "is trying to establish a list of names of

refugees . . . with the help of the cantonal archives," and that,. of the cantons, only Geneva is likely to have a "substantially complete set of data concerning refugees turned back at the border." *Id.* To that end, the SFA has contacted the Geneva archives for assistance in compiling this information. *Id.*

If it proves impossible to assemble the information needed because Swiss entities (including cantonal entities) refuse to provide information that they have in their possession that is needed for the fair administration of the Refugee Class, I will consider an application for modification of the enforceability of releases with respect to those entities.

### G. *Administration of Slave Labor Class I*

Slave Labor Class I consists of victims of Nazi persecution who performed slave labor "for companies or entities that actually or allegedly deposited the revenues or proceeds of that labor with, or transacted such revenues or proceeds through, Releasees." Settlement Agreement ¶ 8.2(c). The Special Master has expressed concern over the ability to administer Slave Labor Class I in the absence of information identifying those German companies within the purview of this class definition. The information is necessary to determine whether a presumption is warranted in connection with the administration of Slave Labor Class I that virtually all German companies that employed slave labor also "deposited" or "transacted" the revenues or proceeds of this labor in Switzerland. Such a presumption would simplify the administration of Slave Labor Class I by making it unnecessary for each claimant to prove a link between the German company for which slave labor was performed and a Swiss bank. I am informed that the SFA appears to have made available the necessary information. Neuborne Decl. II ¶ 39.

### H. *Administration of Slave Labor Class II*

Slave Labor Class II consists of individuals who performed slave labor "at any

facility or work site, wherever located, actually or allegedly owned, controlled, or operated by any corporation or other business concern headquartered, organized, or based in Switzerland or any affiliate thereof." Settlement Agreement ¶ 8.2(d). The membership of Slave Labor Class II, unlike the other classes, is not limited to victims of Nazi persecution who were Jewish, Romani, Jehovah's Witnesses, homosexual, or physically or mentally disabled. The Special Master has expressed concern over the ability to administer Slave Labor Class II in the absence of information concerning the identities of persons who performed slave labor for a Swiss company or its affiliates during World War II. When this class was included in the Settlement Agreement, the defendant banks represented that Slave Labor Class II consists of an extremely small number of persons who may have performed slave labor directly for an extremely small number of Swiss companies during World War II. Since then, they have backed off of this representation. In a letter to me dated July 11, 2000, counsel for the defendant banks stated the following:

> Please note that our assertions about the number of Swiss companies that used slave labor is based on our best estimate of historical facts. The banks have never, and do not now, represent that we have specific knowledge regarding the extent to which Swiss companies used slave labor. No systematic or scientific investigation has been done on this issue.... [T]he Bergier Commission's [forthcoming] report will presumably shed some light on this aspect of Switzerland's history.

Letter of Roger Witten, Esq. (July 11, 2000) at 3.

In the absence of information concerning the identities of the Slave Labor Class II members, it will prove extremely difficult to notify claimants that they may have a right to recover from the settlement fund. Indeed, because the Slave Labor Class II releasees consist almost entirely of affiliates or subsidiaries of Swiss entities that were incorporated in Germany and elsewhere, members of the class—*e.g.*, those who were forced to perform slave labor for a Swiss company in Germany or elsewhere, but who had no reason to know at the time that the company was Swiss—may not be aware that they are in the class even if they have notice of the settlement. Moreover, without information as to the numbers of slave laborers, it will not be possible for the Special Master to make an intelligent allocation of the proceeds of the settlement fund.

Research by the SFA has failed to develop information concerning the identities of potential Slave Labor Class II claimants. Nor has the Special Master been able to develop significant information as to the identities of Swiss companies or their affiliates that may have utilized slave labor during the relevant period. I am informed that the SFA appears to be cooperating in assembling certain information as to Swiss companies that may have utilized slave labor. Neuborne Decl. II ¶ 40. Nevertheless, that information is incomplete, *see* SFA, *Forced Labor in Swiss Controlled Firms in NS Germany; Records in the Swiss Federal Archives; Preliminary Overview* (Apr. 10, 2000), and there is little prospect that a complete list can be obtained in sufficient time to make the necessary use of it. Indeed, the SFA has advised the Special Master that it could not identify "tangible information reflecting the situation of forced labor workers in German branches of Swiss firms[,] ... [although] indirect and scattered evidence could be found with time consuming research." *Id.* at 2.

Under these circumstances, those Swiss entities that seek releases from Slave Labor Class II are directed to identify themselves to the Special Master within 30 days of the date of this memorandum and order. The failure of Swiss entities seeking releases from Slave Labor Class II claims to identify themselves will result in the denial of a release and permit those who have

claims against those entities to pursue such claims independently of this lawsuit. Those three Swiss companies with respect to which the SFA already has provided information are now entitled to the benefits of releases for the utilization of approximately 2,500 slave laborers, subject to compliance with their good faith duty to provide information in their possession regarding the names of these slave laborers. *See supra* at 158–59.

I do not regard this order as effecting a material alteration of the terms of the Settlement Agreement. Indeed, without the ability to notify class members of the names of entities who employed slave laborers, releases against those entities would be worthless in any event. I repeat here what I said earlier: requiring this minimal cooperation as a condition for a release does not deny any benefit that the Settlement Agreement confers. Simply stated, this means that a party who seeks to enforce a contract for a release extinguishing the claims of a particular class cannot in good faith withhold its identity from class members who need that information in order to claim benefits to which they are entitled. Nor can it ignore reasonable orders pursuant to Fed.R.Civ.P. 23(d) to provide such information.

## I. *The Defendant Banks' Threat to Repudiate the Amendments to the Settlement Agreement*

Prior to issuing this opinion, I provided the defendant banks with a draft of the foregoing discussion of the problems associated with Slave Labor Class II. The defendant banks have advised me that, if I required business entities that utilized slave labor to identify themselves as a condition to obtaining releases, they would repudiate the amendments to the Settlement Agreement that have been negotiated tediously over the last few months with my informal approval. These amendments, which have nothing to do with the

issues relating to Slave Labor Class II, have not yet been executed in writing.

The reason for the defendant banks' unhappiness with the conditions placed upon the Slave Labor Class II releases is that "[o]ne of the fundamental premises for our 'all Switzerland' settlement was that, in exchange for a payment of $1.25 billion, all Swiss companies would be released from slave labor claims." Letter of Roger Witten, Esq. (July 11, 2000) at 1. Moreover, they claim that

> [i]t is not practical for the defendant banks to make public requests to all Swiss companies to investigate whether any of their subsidiaries used slave labor during World War II in order to respond to such a condition, nor would this be in harmony with the spirit or the terms of the settlement agreement.

*Id.*

I note at the outset that the $1.25 billion payment that defendants Union Bank of Switzerland and Credit Suisse made in exchange for releases for "all Switzerland" is money that could reasonably be said to have belonged to depositors who were victims of the Holocaust. Indeed, as I have already noted, the Volcker Committee's estimates indicate that the total value of these accounts could exceed $1.25 billion. *See supra* at 153–54 & footnote 2. The only reason for settling the case for less was the practical problem created by the wholesale destruction of records and, to a degree, the passage of time. Indeed, there was once a time when the Swiss promised that, if account holders could not be identified, this money would be paid to a charitable foundation for Holocaust survivors. As counsel for the defendant banks represented when arguing in support of his pretrial motion to dismiss,

> [t]he banks have committed, and I reiterate the commitment here; we will pay out any dormant account[4] dating from

4. Moments later, counsel conceded that he was referring to all "deposited assets," of which "dormant accounts" are simply a sub-

that era, any and all dormant accounts, if it's linked to a specific claimant or if it's not linked. If there's any reason to believe that any account could have come from a dormant account, a Holocaust victim, the banks will disgorge or pay out that money. If it can't be linked, it will be paid out to appropriate, international, charitable organizations, in consultation with relevant Jewish and other Holocaust organizations.

As I said, this process arises from directives of the [SFBC], and as such represents executive actions of the Swiss government, to which this Court, under the precedents, owes some deference, in my view a great deal of deference.

Transcript of Oral Argument (July 31, 1997) at 33–34; *see also* Defs.' Mem. in Support of Motion to Dismiss on *Forum Non Conveniens* Grounds (May 15, 1997) at 27–28.

In any event, I do not propose to deny releases to which Swiss companies who utilized slave laborers are entitled. I am simply requiring them to identify themselves and provide information (if they possess it) that is critical to the fair and efficient administration of Slave Labor Class II. Indeed, the proposed modification of the Settlement Agreement, as it relates to Swiss insurance companies who seek releases, contemplates notice to the class identifying each of the insurers who are to be released so that class beneficiaries will have available critical information necessary to file a claim. The same good faith is all that is required of the Slave Labor Class II releasees.

The suggestion that it is "not practical for the defendant banks to make public requests to all Swiss companies to investigate whether any of their subsidiaries used slave labor" is simply conclusory. I note, to begin with, that the request for this information is not new; it has been made repeatedly by the Special Master since his appointment. Nevertheless, cooperation by the SFA was forthcoming only recently.

Moreover, although he did not say when, counsel for the defendant banks acknowledged that the Bergier Commission will publish a report concerning the utilization of slave laborers by the Swiss "that will be a significant additional informational resource." Letter of Roger Witten, Esq. (July 11, 2000) at 2. Under these circumstances, it seems reasonable to conclude that the small number of Swiss companies who the defendant banks suggested utilized slave laborers have good reason to know who they are. Nor is it my intention that any company be certain that it or its affiliates employed slave labor. The fact that they believe that it was likely or probable will suffice.

In sum, all I ask is good faith. Instead, defendants Union Bank of Switzerland and Credit Suisse threaten to disavow unrelated amendments intended to facilitate the approval of the Settlement Agreement and a fair and equitable distribution process. If they repudiate the modifications, I will approve the Settlement Agreement that was agreed upon initially. I add these words by way of explanation.

The most significant modification to the Settlement Agreement is the provision by which defendants Union Bank of Switzerland and Credit Suisse agree, subject to various conditions, to comply with the recommendations of the Volcker Committee—the cost of which would come out of the settlement proceeds. The repudiation of this particular modification would be a breach of the contractual implied duty of good faith to which they are already obligated and which I have the power to enforce.

The other significant parts of the modifications to the Settlement Agreement involve the *de facto* creation of a sixth class of beneficiaries who would be entitled to file claims against the participating insurance carriers by virtue of (i) those carriers' infusion of an additional $50 million in cash to the settlement fund and (ii) the agreed

set. Transcript of Oral Argument (July 31, 1997) at 36–37.

upon allocation of $50 million of the existing settlement fund to pay such insurance claims. Because this particular modification addresses defects that affect the validity of the releases under the Settlement Agreement, there is good reason to believe that participating insurance carriers will reaffirm this aspect of the renegotiated agreement. Nevertheless, if the carriers do not reaffirm, I will issue a supplemental decision on the enforceability of the original insurance releases.

The last significant modification involves a compromise of a dispute over whether the defendant banks or the settlement fund will bear the costs associated with the administration of the claims resolution process. This dispute was resolved by a modification to the Settlement Agreement that "provide[s] for the acceleration of certain payments, and the modification of the flow of funds between the escrow fund and the settlement fund in order to generate additional interest payments payable to' the settlement fund." Neuborne Decl. II ¶ 29. The accelerated payment schedule should generate between $23–27 million in additional interest. *Id.* This sum may substantially cover the costs of the continued functioning of the Claims Resolution Tribunal.

If the compromise is repudiated, paragraph 4.1 of the Settlement Agreement, which reads as follows, would apply:

> Although the parties anticipate that the ICEP and the Claims Resolution Tribunal will continue, *at certain Releasees' expense,* in a manner that is appropriate in light of this Settlement Agreement, Releasees shall have no additional financial exposure or additional liability of any kind whatsoever beyond the Settlement Amount on account of the activities or findings of the ICEP ... or the Claims Resolution Tribunal, or on account of any cessation of or change in the activities of the ICEP ... or the Claims Resolution Tribunal, *excluding costs associated with the functioning of those entities.*

(Emphases added.) While the defendant banks argue that the plain language of paragraph 4.1 requiring them to bear the costs associated with the functioning of the Claims Resolution Tribunal is not what the parties intended, that argument would seem to run afoul of the New York rule that

> a court may not, under the guise of interpretation, make a new contract for the parties or change the words of a written contract so as to make it express the real intention of the parties if to do so would contradict the clearly · expressed language of the contract.... [W]e concern ourselves with what the parties intended, but only to the extent that they evidenced .what they intended by what they wrote.

*Rodolitz v. Neptune Paper Products, Inc.,* 22 N.Y.2d 383, 386–87, 292 N.Y.S.2d 878, 881, 239 N.E.2d 628 (1968) (internal quotation marks omitted); *see also* Settlement Agreement ¶ 16.2 (merger clause).

The least significant aspect of the modifications related to the looted art. I have already noted that the initial agreement did not provide any releases to individual collectors, private foundations and private museums. While it did release claims against Swiss business entities, the modification makes changes with respect to these entities that may be more symbolic than significant. ·

In sum, it is my hope that, upon reflection, defendants Union Bank of Switzerland and Credit Suisse will exercise the good judgment and good faith that they exhibited when they agreed to settle the case. If they do not do so, and instead repudiate the modifications to the Settlement Agreement, then I approve the Settlement Agreement that was agreed upon initially. The differences between the initial agreement and the modified one are not sufficient at this point to upset the finding that the settlement is fair, reasonable and adequate. Indeed, the principal reason for tolerating extended negotiation on the modifications was my belief that a

fair and efficient claims distribution mechanism can best be accomplished by accommodation rather than conflict. The defendant banks now force me to choose between reasonable accommodation and my duty to protect the class beneficiaries. I choose the latter.

### J. Other Objections Concerning Notice

In addition to the objections discussed at length above, a handful of other objectors challenged portions of the overall notice plan, governing the form, content and dissemination of notice to class members. I have considered those objections and determined that those objections are without merit.[5] For example, an advocate for the Roma incorrectly criticized the notices for not being translated into certain languages spoken by Roma and Sinti. However, the notice was in fact translated into languages spoken by Roma and Sinti.

The notice provided in this case was detailed, and contained far more than the amount of information necessary to satisfy Fed.R.Civ.P. 23 and due process. Moreover, the forms of notice were accurate, objective and understandable, and followed the guidelines and forms contained in *MCL 3d*, §§ 30.211, 30.212, and § 41.4 (sample class action orders). Persons with questions about any aspect of the settlement were able to access community resources, globally, including by speaking to persons who were trained by the notice administrators and settlement class counsel on settlement issues, such as the nature and scope of the release. Community outreach programs were aggressively implemented. In addition to the worldwide community outreach program described in the notice plan, a supplemental community outreach program was implemented in the

United States, Canada, Israel and Australia to make additional volunteer and other resources available to class members who had questions regarding the proposed settlement, or regarding the Initial Questionnaire.

### K. Attorneys' Fees

Objections regarding attorneys' fees are premature. Although fee applications have been filed (and do not appear to exceed one percent of the total recovery *if* the applications are granted in their entirety), I have not yet made any decision regarding those applications. Instead, I have entered an order deferring a hearing on attorneys' fees until the date set for the hearing on the proposed plan of allocution and distribution of the settlement proceeds. Pursuant to that order, objections and comments to the application for attorneys' fees will be due two weeks before the hearing. There will also be full disclosure of all supporting time records.

\* \* \*

I have considered all other comments and objections that have been made, and find that the Settlement Agreement is fair, reasonable and adequate and warrants final approval.

### IV. Maintenance of Certification of Settlement Classes

I have already made numerous findings in support of certification of the five settlement classes defined above. No actual, non-speculative conflicts among class members exist. The settlement itself does not purport to allocate the fund to specific classes, subclasses, or claimants. Since the initial certification of the settlement classes, no facts have changed, and no case

---

**5.** Disability Rights Advocates ("DRA"), a nonprofit entity appearing on behalf of, although not formally representing, those members of the plaintiff classes with physical and mental disabilities (and their heirs), initially voiced an objection to the notice plan because it did not specifically target organizations benefit-

ting persons with disabilities. Subsequently, DRA withdrew its objection. *See* Letters of Sid Wolinsky, Esq. (July 5 and July 31, 2000). DRA's objection does not have any merit. Nevertheless, it is unnecessary to address the objection in detail here in light of its unconditional withdrawal.

law has developed, that call into question the initial certification order. *Ortiz*, 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715, decided after I entered the preliminary approval and certification order, does not call into question the propriety of the certification of these settlement classes.

### Conclusion

The Settlement Agreement is granted final approval. The defendant banks are directed to advise me within seven business days of the date of this order whether they intend to adhere to the amendments to the Settlement Agreement. If they do, I will enter a final judgment to reflect that the Settlement Agreement, as amended by Amendment 2 and the memorandum to file (*see* footnote 3, *infra*), is granted final approval. If they do not, I will enter a final judgment on the Settlement Agreement.

**SO ORDERED.**