**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2004

(Argued: May 16, 2005                    Decided: September 8, 2005)
                                         Errata Filed: October 4, 2005)
Docket No. 04-1898(L), 04-1899(CON)

IN RE HOLOCAUST VICTIM ASSETS LITIGATION


SAMUEL J. DUBBIN,

    *Plaintiff-Appellant*,

PINK TRIANGLE COALITION, KARL LANGE and PIERRE
SEEL,

    *Interested Parties-Cross-Appellants*,

        -v.-

UNION BANK OF SWITZERLAND, SWISS BANK CORP., also
known as Swiss National Bank, BANKING INSTITUTIONS #1-
100, JOHN DOES #1-100, CERTAIN SWISS BANK ACCOUNTS
described as follows, Swiss Bankers Assoc., Swiss Bankers
Association, and Bank of International Settlements,

    *Defendants-Appellees*,

PLAINTIFFS' EXECUTIVE COMMITTEE SETTLEMENT CLASS,

    *Interested-Party-Appellee*,

JUDAH GRIBETZ,

    *Special Master*,

GIZELLA WEISSHAUS, on behalf of herself and all other
persons of all national origins, ethnic groups, races, creeds
and colors, similarly situated as victims and survivors of the
Nazi Holocaust and JACOB FRIEDMAN,

*Plaintiffs*,

WORLD JEWISH RESTITUTION ORGANIZATION, SOUTH
FLORIDA HOLOCAUST COALITION and THOMAS WEISS,

*Intervenor-Plaintiffs*,

WASHINGTON STATE INSURANCE COMMISSIONER,
GREGORY TSVILICHOVSKY, MATVEY YENTUS, SOFIYA
BLOSHTEYN, OLGA TSVILIKHOVSKYA, LARISA RYABAYA,
ROSA YENTUS, PAVEL ARONOV, LUBOV STARODINSKAYA,
and ELIAZAR BLOSHTEYN,

*Interested-Parties*,

POLISH AMERICAN DEFENSE COMMITTEE, INC., a non-profit
California Corporation, IRVING WOLF, DISABILITY RIGHTS
ADVOCATES AND DIRECTOR OF INTERNATIONAL AFFAIRS
AND REPRESENTATIVE TO THE UNITED NATIONS OF
AGUDATH ISRAEL WORLD ORGANIZATION,

*Movants*,

G.K., a Holocaust Survivor and member of the New
American Jewish Club of Miami, L.K., a Holocaust Survivor
and member of the New American Jewish Club of Miami,
F.K., a Holocaust Survivor and member of the New
American Jewish Club of Miami, HOLOCAUST SURVIVORS
FOUNDATION USA, INC. (HSF), DAVID SCHAECTER,
individually and as President of the Holocaust Survivors
Foundation-USA, Inc., LEO RECHTER, individually and as
President of the National Association of Jewish Holocaust
Survivors (NAHOS), NATIONAL ASSOCIATION OF JEWISH
HOLOCAUST SURVIVORS (NAHOS), DAVID MERMELSTEIN,
individually and as President of the New American Jewish
Club of Miami and President of the South Florida Holocaust
Survivors Coalition, NEW AMERICAN JEWISH CLUB OF
MIAMI, SOUTH FLORIDA HOLOCAUST SURVIVORS
COALITION, ALEX MOSKOVIC, individually and as President
of the Child Survivors/Hidden Children of the Holocaust,
Inc., CHILD SURVIVORS/HIDDEN CHILDREN OF THE
HOLOCAUST, ESTHER WIDMAN, individually as member of
the National Association of Jewish Holocaust Survivors
(NAHOS), FRED TAUCHER, individually and as President of
the Survivors of the Holocaust Recovery Project (SHARP),
SURVIVORS OF THE HOLOCAUST RECOVERY PROJECT

2

(SHARP), NESSE GODIN, individually and as President of the Jewish Holocaust Survivors and Friends of Greater Washington, JEWISH HOLOCAUST SURVIVORS AND FRIENDS OF GREATER WASHINGTON, HENRY SCHUSTER, individually and as President of the Holocaust Survivors Group of Southern Nevada, HOLOCAUST SURVIVORS GROUP OF SOUTHERN NEVADA, HERBERT KARLINER, individually and as a member of the Holocaust Survivors Foundation-USA, Inc. and the South Florida Holocaust Survivors Coalition, LEA WEEMS, individually and as President of the Houston Council of Jewish Holocaust Survivors, HOUSTON COUNCIL OF JEWISH HOLOCAUST SURVIVORS, SAM GASSON, individually and as President of the Habonim Cultural Club, Survivors of the Holocaust, HABONIM CULTURAL CLUB, SURVIVORS OF THE HOLOCAUST, HOLOCAUST SURVIVORS OF SOUTH FLORIDA, DENA AXELROD, individually and as a member of the Child Survivors of the Holocaust, South Florida Group and the South Florida Holocaust Survivors Coalition, SAUL BIRNBAUM, individually and as President of the Holocaust Survivors Club of Boca Raton (Century Village), HOLOCAUST SURVIVORS CLUB OF BOCA RATON (CENTURY VILLAGE), MIRIAM RUBIN, Individual Holocaust Survivor, DORIS FEDRID, Individual Holocaust Survivor, HELGA GROSS, Individual Holocaust Survivor, NATIONAL FEDERATION OF THE BLIND, USA, GERMAN COUNCIL OF CENTERS FOR SELF-DETERMINED LIVES, Finist, Russia, EQUAL ABILITY LIMITED, United Kingdom, THROUGH THE LOOKING GLASS, USA, DISABLED PERSONS INTERNATIONAL, CANADA, WORLD INSTITUTE ON DISABILITY, USA, CENTER FOR INDEPENDENT LIVING, BULGARIA, DISABILITY RIGHTS EDUCATION AND DEFENSE FUND, US, CENTER FOR INDEPENDENT LIVING, BERKELEY, USA, CALIFORNIA FOUNDATION FOR INDEPENDENT LIVING CENTER, INDEPENDENT LIVING RESOURCE CENTER, SAN FRANCISCO, COMPUTER TECHNOLOGIES PROGRAM, USA, RAGGED EDGE/AVACADO PRESS, USA, LEGAL ADVOCACY FOR THE DEFENSE OF PEOPLE WITH DISABILITIES, NATIONAL CONFEDERATION OF DISABLED PERSONS, GREECE AND DE JURE ALAPITVANY, HUNGARY,

*Appellants.*

Before: MESKILL, NEWMAN, and CABRANES, *Circuit Judges*.

Appeal from a memorandum and order of the United States District Court for the Eastern District of New York (Edward R. Korman, *Chief Judge*) allocating settlement funds in the Holocaust Victim Assets Litigation. Appellants challenge the geographic distribution of funds earmarked for needy Jewish Holocaust victims.

AFFIRMED.

EDWARD LABATON, Goodkind Labaton Rudoff & Sucharow, LLP, New York, NY (Arthur J. England, Jr., Charles M. Auslander, and Brenda K. Supple, Greenberg Traurig, P.A., Miami, FL; Samuel J. Dubbin, Dubbin & Kravetz, LLP, Coral Gables, FL; Stephen Burbank, Philadelphia, PA*, of counsel*) *for Appellants*.

BURT NEUBORNE, New York, NY, and ROBERT A. SWIFT, Kohn Swift & Graf, PC, Philadelphia, PA (Melvyn I. Weiss, Deborah M. Sturman, Milberg Weiss Bershad & Schulman LLP, New York, NY; Morris A. Ratner, Caryn Becker, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY) *for Appellees*.

Alan S. Jaffe (Charles S. Sims, Gregg M. Mashberg, and Frank R. Scibilia, *of counsel*), Proskauer Rose LLP, New York, NY *for amici curiae The American Jewish Joint Distribution Committee* and *Idud Hasadim*.

Marshall Beil, McGuire Woods LLP, New York, NY (Joseph S. Kaplan, and Christine M. Fecko, McGuire Woods LLP, New York, NY; Michael D. Lissner, Lissner & Lissner, New York, NY, *of counsel*) *for amici curiae The Association of Jewish Family & Children's Agencies, Inc., The Blue Card, Inc., The Nachas Health and Family Network, Inc., and the Margaret Tietz Nursing and Rehabilitation Center*.

JOSÉ A. CABRANES, *Circuit Judge*:

The Holocaust Survivors Foundation-U.S.A., Inc. ("HSF"), and several individuals and organizations, appeal from the March 9, 2004 memorandum and order of the United States District Court for the Eastern District of New York (Edward R. Korman, *Chief Judge*).[1] The District Court rejected the HSF's objections to the Court's earlier orders, which had allocated supplemental funds to one of the settlement classes in the litigation styled as the Holocaust Victim Assets Litigation. On appeal, the HSF continues to object to the manner in which the District Court allocated funds among class members. In particular, the HSF asserts that needy Holocaust survivors residing in the United States have received a disproportionately small allocation, relative to the needy survivors residing in the former Soviet Union ("FSU").

Because the District Court acted well within the bounds of its discretion in allocating the settlement fund, we affirm.

## BACKGROUND

### I. Swiss Bank Settlement

The Holocaust Victim Assets Litigation began in 1996 and 1997, when several class actions against leading Swiss banks were filed in the District Court and subsequently consolidated. *See In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 141 (E.D.N.Y. 2000). The District Court has described the principal claims of these class actions as follows:

> Plaintiffs alleged that, before and during World War II, they were subjected to persecution by the Nazi regime, including genocide, wholesale and systematic looting of personal and business property and slave labor. Plaintiffs alleged that, in knowingly retaining and concealing the assets of Holocaust victims, accepting and laundering illegally obtained Nazi loot and transacting in the

---

[1] This appeal was consolidated with an appeal from the District Court's denial of attorney's fees brought by Samuel J. Dubbin, HSF's counsel. We adjudicate Dubbin's appeal in a separate opinion. *See In re Holocaust Victim Assets Litig.*, ___ F.3d ___ (2d Cir. 2005).

5

> profits of slave labor, Swiss institutions and entities, including the named defendants, collaborated with and aided the Nazi regime in furtherance of war crimes, crimes against humanity, crimes against peace, slave labor and genocide. Plaintiffs also alleged that defendants breached fiduciary and other duties; breached contracts; converted plaintiffs' property; enriched themselves unjustly; were negligent; violated customary international law, Swiss banking law and the Swiss commercial code of obligations; engaged in fraud and conspiracy; and concealed relevant facts from the named plaintiffs and the plaintiff class members in an effort to frustrate plaintiffs' ability to pursue their claims. Plaintiffs sought an accounting, disgorgement, compensatory and punitive damages, and declaratory and other appropriate relief.

*Id.* at 141-42. In May 1997, defendant banks moved to dismiss the litigation or, in the alternative, to stay the proceedings. *Id.* at 142.

While defendants' motions were pending, the parties engaged in settlement discussions facilitated by Stuart E. Eizenstat, then Under Secretary of State and Special Representative of the President and Secretary of State on Holocaust Issues. *Id.* In August 1998, after the District Court became involved in the discussions, the parties agreed in principle to settle the litigation for $1.25 billion to be distributed for the benefit of "Jews, homosexuals, Jehovah's Witnesses, the disabled and Romani—groups recognized by the United Nations as having been the targets of systematic Nazi persecution." *Id.* at 142-43. On January 26, 1999, the parties formally executed the Class Action Settlement Agreement ("Settlement Agreement"), subject to the District Court's approval.

On March 30, 1999, the District Court provisionally approved the Settlement Agreement and certified, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3),[2] five settlement classes:

---

[2] Fed. R. Civ. P. 23 provides, in relevant part:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

6

Deposited Assets Class, Looted Assets Class, Slave Labor Class I, Slave Labor Class II, and Refugee Class. *Id.* at 143-44. Membership in all except the Slave Labor Class II is limited to members of groups targeted for Nazi persecution.[3]

Two of the classes are particularly relevant to this appeal. The Deposited Assets Class, as its name suggests, consists of Nazi persecution victims and their heirs whose claims are grounded in assets that were *deposited* by the victims with Swiss banks.[4] *See id.* at 143. The Looted Assets Class, by contrast, includes principally "those who claim their property was *looted* by Nazis and then *disposed*

---

(4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

[3] Membership in those four classes was limited to "Victim[s] or Target[s] of Nazi Persecution," a phrase that encompassed individuals or entities "persecuted or targeted for persecution by the Nazi Regime because they were or were believed to be Jewish, Romani, Jehovah's Witness, homosexual, or physically or mentally disabled or handicapped." Settlement Agreement § 1.

[4] Specifically, the Deposited Assets Class includes "Victims or Targets of Nazi Persecution and their heirs, successors, administrators, executors, affiliates and assigns who have or at any time have asserted, assert or may in the future seek to assert Claims against any Releasee for relief of any kind whatsoever relating to or arising in any way from Deposited Assets or any effort to recover Deposited Assets." Settlement Agreement § 8.2(a). It should be noted that the term "Releasees" under the Settlement Agreement is not limited to Swiss bank defendants, and that the Settlement Agreement resolved legal claims against, *inter alia*, the Swiss government, the Swiss National Bank (that is, Switzerland's central bank), and certain Swiss businesses. *Id.* at § 1.

7

of through the Swiss Banks."[5] *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 185 (2d Cir. 2001) (emphasis added).

The Settlement Agreement provided for the appointment of a Special Master to "develop a proposed plan of allocation and distribution of the Settlement Fund, employing open and equitable procedures to ensure fair consideration of all proposals for allocation and distribution." Settlement Agreement § 7.1. As Lead Settlement Counsel, Professor Burt Neuborne of the New York University Law School,[6] explained:

> [t]he decision to utilize a Special Master to propose a plan of allocation and distribution was motivated by a desire to spare Holocaust survivors from being forced into an adversarial relationship that would have required them to squabble over a settlement fund that, while substantial, is necessarily insufficient to do full justice to all members of each plaintiff class. It was hoped that a neutral Special Master, acting with the guidance of the affected community, could conduct a serious inquiry into the facts and law, and propose a plan of allocation and distribution that would do non-adversarial justice to the claims of all class members.

*In re Holocaust Victim Assets Litig.*, Submission of Lead Settlement Counsel in Support of the Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds, No. CV 96-4849, at

---

[5] The Settlement Agreement defined members of the Looted Assets Class as "Victims or Targets of Nazi Persecution and their heirs, successors, administrators, executors, affiliates and assigns who have or at any time have asserted, assert or may in the future seek to assert Claims against any Releasee for relief of any kind whatsoever relating to or arising in any way from Looted Assets or Cloaked Assets or any effort to recover Looted Assets or Cloaked Assets." Settlement Agreement § 8.2(b). The term "Looted Assets" refers to assets "actually or allegedly belonging in whole or in part to Victims or Targets of Nazi Persecution that were actually or allegedly stolen, expropriated, Aryanized, confiscated, or that were otherwise wrongfully taken by, at the request of, or under the auspices of, the Nazi Regime." *Id.* at § 1. The term "Cloaked Assets," by contrast, refers to assets belonging to, *inter alia*, entities and individuals "associated with the Nazi Regime . . . , the identity, value or ownership of which was in fact or allegedly disguised by . . . any Releasee." *Id.*

[6] Although the Lead Settlement Counsel does not represent any party in the context of these appeals, he has played a number of important roles in this litigation, both as a representative of the plaintiffs and as "something of a general counsel to the administration of the settlement fund." *In re Holocaust Victim Assets Litig.*, No. CV 96-4849, slip op. at 3 (E.D.N.Y. Sept. 13, 2004). The District Court has authorized the Lead Settlement Counsel to provide "an adversarial defense" of the District Court's position in this Court. *Id.*, slip op. at 1.

8

3 (E.D.N.Y. Nov. 20, 2000). On March 31, 1999, the District Court appointed The Honorable Judah Gribetz as Special Master for this litigation.[7]

Under the District Court's direction, an extensive plan was implemented to give notice of the Settlement Agreement to members of the settlement classes. 105 F. Supp. 2d at 144-45. This notice plan included "(i) world-wide publication, (ii) press coverage, (iii) an extensive community outreach program, (iv) a direct mail program that included the sending of more than 1.4 million notice packages directly to potential class members in at least 48 countries and (v) an Internet notice effort." *Id.* The District Court then conducted two fairness hearings—one in its Brooklyn courtroom on November 29, 1999 and another by telephone connection with Jerusalem on December 14, 1999. *Id.* at 145.

On August 9, 2000, the District Court's final order and judgment approving the Settlement Agreement was entered.[8] In discussing the procedural fairness of the settlement, the District Court observed:

> [B]ased upon my extensive personal involvement in the process, I know that the compromise was reached as the result of lengthy, well-informed and arm's-length negotiations by competent and dedicated counsel who provided loyal and effective legal representation to all

---

[7] As the District Court later underscored, Mr. Gribetz

> is an extraordinarily able lawyer with a long record of distinguished public service. He has served as Counsel to the Governor of the State of New York and as Deputy Mayor of the City of New York. He has contributed his time and energy to charitable and community organizations too numerous to recite. Most importantly, he has a deep understanding of all issues related to the Holocaust. He is a member of the Board of the Museum of Jewish Heritage—A Living Memorial to the Holocaust, which is located in New York. He is also the author of The Timetables of Jewish History (1993).

*In re Holocaust Victim Assets Litig.*, 2000 U.S. Dist. LEXIS 20817, at *5-*6, 2000 WL 33241660, at *1 (E.D.N.Y. Nov. 22, 2000).

[8] The Settlement Agreement was approved by the District Court as amended by the parties, most recently on on August 9, 2000. Subsequent references to the Settlement Agreement are to the amended version granted final approval by the District Court.

9

parties. Counsel for the plaintiff settlement classes are experienced plaintiffs' advocates and class action lawyers. One could not assemble a more capable group. Among the lawyers for the plaintiffs who are serving without fee are Professor Burt Neuborne of New York University Law School, a brilliant scholar and advocate, who developed the class's legal theories and who presented legal argument on behalf of plaintiffs, and Melvyn H. Weiss and Michael D. Hausfeld, leading members of the class action bar, who ably led plaintiffs' negotiating team. While I have independently evaluated the fairness of the settlement, the unanimous support of this group in favor of final approval is entitled to great weight.

*Id.* at 146. The Court declined, however, to embrace at that point any specific method of allocating and distributing the $1.25 billion fund, explaining the sequence of its decisions as follows:

[O]rdinarily, it is preferable to provide specific information to class members concerning their likely recovery prior to the fairness hearing in order to permit criticism and challenge, if appropriate. However, the special circumstances of this litigation, involving five worldwide settlement classes arising out of events that transpired approximately 60 years ago, make it virtually impossible to provide specific information to individuals about their precise recovery prior to the completion of the elaborate claims processes contemplated by the Settlement . . . .

. . . . [O]nce I have approved the basic fairness of the settlement and its attendant procedures, the Special Master will promptly issue his recommendations concerning allocation and distribution and those recommendations will be transmitted for comment and criticism to the members of the plaintiff classes. Only after I approve the plan of allocation and distribution will a claims process capable of generating specific figures be possible.

*Id.* at 150-51.

On September 11, 2000, the Special Master submitted to the District Court a proposal for the allocation and distribution of settlement proceeds. *See In re Holocaust Victim Assets Litig.*, No. CV 96-4849 (E.D.N.Y. Sept. 11, 2000) (Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds) ("Special Master's Proposal"), *at* J.A. 714. The Special Master reported that,

10

in the course of developing his proposal, he had consulted with dozens of individuals, "reviewed many formal proposals submitted from around the world," and received thousands of letters, primarily from Holocaust survivors. *Id.* at 2; *at* J.A. 720. The suggestions received by the Special Master shared several "common themes":

> that the task before the Special Master and, ultimately, the [District] Court, is daunting; that the settlement of the litigation against the Swiss banks represents, in some small fashion, another historic opportunity in the attempt to redress the indescribable wrongs that have been wrought against the victims of the Holocaust; and that the allocation and distribution of the $1.25 billion settlement fund should be meaningful, with some lasting impact upon class members.

*Id.* (footnote omitted). Many of those who communicated with the Special Master, especially Holocaust survivors, viewed the Swiss Bank settlement as "a further step along the often tortuous path toward accountability and remembrance." *Id.* Furthermore, the Special Master undertook his task—the "daunting" task of allocating and distributing "an historic, yet limited, settlement fund in a manner which is fair, equitable and consistent with governing legal principles"—with the recognition that

> no amount of money could begin to compensate the millions of victims of Nazi persecution for the horrors they suffered during the Holocaust, that no amount of money could restore the generations that were lost, and that no amount of money could right the injustice perpetrated by Nazi Germany that has been termed "one of the greatest thefts by a government in history."

*Id.* at 2-3 (quoting Stuart E. Eizenstat, *Foreword* to Stuart E. Eizenstat & William Z. Slany, U.S. Dep't of State, *U.S. and Allied Efforts to Recover and Restore Gold and Other Assets Stolen or Hidden by Germany During World War II—Preliminary Study* at iii, iii (1997), *available at* http://www.state.gov/www/ regions/eur/ngrpt.pdf), *at* J.A. 720-21.

In allocating the $1.25 billion settlement fund among the five settlement classes, the Special Master concluded that the Settlement Agreement accorded "priority" to distributions directed to

11

members of the Deposited Assets Class. *Id.* at 10-12, *at* J.A. 728-30. The Special Master

underscored that

> [m]ore than three years after the complaints were filed in this lawsuit, the unprecedented forensic accounting investigation conducted by the Independent Committee of Eminent Persons ("ICEP," also known as the "Volcker Committee" after its Chairman, [the former Chairman of the Federal Reserve Board] Paul A. Volcker), concluded that some 54,000 Swiss bank accounts are "probably" or "possibly" related to Holocaust victims, and, accordingly, that these accounts can be returned to their proper owners, virtually all of whom by now are the original owners' heirs.

*Id.* at 11 (footnote omitted), *at* J.A. 729. Even before the Special Master submitted his proposal, the

District Court noted that "the report of the Volcker Committee, which included three members

appointed by the Swiss Bankers Association, . . . provided legal and moral legitimacy to the claims

asserted . . . on behalf of the members of the Deposited Assets Class." *In re Holocaust Victim Assets*

*Litig.*, 105 F. Supp. 2d at 153. Relying on the report of the Volcker Committee and on consultations

with that Committee's members, the Special Master estimated that "the value of all bank accounts

that will be repaid is within the range of $800 million," and allocated that amount to the Deposited

Assets Class. Special Master's Proposal at 15; *at* J.A. 733.

The remainder of the $1.25 billion fund became available for, *inter alia*, allocation to the

other four settlement classes, including the Looted Assets Class. *Id.* In addition, the Special Master

noted that some of the initial $800 million allocation to the Deposited Assets Class may remain

unclaimed after the conclusion of the claims process, and may therefore be reallocated to other

settlement classes. *Id.*

The Special Master then explained that allocation and distribution of funds to the Looted

Assets Class posed unusual challenges:

> There is scarcely a victim of the Nazis who was not looted, and on nearly an incomprehensible scale. . . .

. . .

> With only limited exceptions, however, the current historical record simply does not permit precise determinations even as to the material losses in total, much less the nature and value of the loot traceable to Switzerland or Swiss entities. . . .

> It is neither justifiable nor appropriate to select which looting victims may be entitled to recompense from this $1.25 billion Settlement Fund based entirely upon the happenstance of where the Nazi Regime chose to direct which loot, which records of the plunder happen to survive, and which items one may hazard a guess may have found their way to or through Switzerland. Every surviving "Victim or Target" was looted—many hundreds of thousands of people *excluding heirs*.

Special Master's Proposal at 111-14 (emphasis in original), *at* J.A. 829-32. In light of these considerations, the Special Master rejected a distribution process consisting of individualized valuations of Looted Assets Class members' claims, concluding that such a case-by-case approach would create "an unwieldy and enormously expensive apparatus" and would generate administrative expenses that "would [have] unjustifiably deplete[d] the Settlement Fund." *Id.* at 114-15, *at* J.A. 832-33. The Special Master also recommended against distributing settlement proceeds to all Looted Assets Class members on a *pro rata* basis, since each class member would then receive "little more

13

than a few dollars"—a result the Special Master considered "obviously untenable."[9]  *Id.* at 115, *at* J.A. 833.

Instead, the Special Master recommended that (at least during the first stage of payments from the settlement fund) distributions target the surviving victims of Nazi persecution rather than the victims' heirs.  *Id.* at 17-19, *at* J.A. 735-57.  Even more significant for this appeal is the Special Master's recognition that the settlement fund, while insufficient to "repay even a small fraction of what was looted in the Holocaust," presented "an opportunity to provide meaningful assistance to the Looted Asset Class members who are in the greatest financial need."  *Id.* at 116, *at* J.A. 834.  He therefore proposed "an initial allocation of $100 million to *cy pres* programs[10] designed to benefit the neediest elderly survivors of the Holocaust—who perhaps would be less in need today had their

---

[9]  As the Special Master explained,

> The estimate of Jewish survivors of Nazi persecution alone ranges from 832,000 to 960,000, a number increased by the varied estimates of Roma, Jehovah's Witness, disabled and homosexual survivors.  Moreover, each of the five classes includes, among others, "heirs," a term undefined in the Settlement Agreement but governed by New York law.  New York law does not limit "heirs" to children, spouses or even near relatives.  Rather, the definition of "heirs" extends well beyond even great-grandchildren of grandparents—and, moreover, must be determined at the time of the decedent's death.  Under this definition, the Special Master believes that heirs of Nazi victims, all apparently class members, easily number in the millions.

Special Master's Proposal at 9 (internal citation and footnotes omitted), *at* J.A. 727.

[10]
> The *cy pres* doctrine takes its name from the Norman French expression, *cy pres comme possible*, which means "as near as possible."  The doctrine originated to save testamentary charitable gifts that would otherwise fail.  Under *cy pres,* if the testator had a general charitable intent, the court will look for an alternate recipient that will best serve the gift's original purpose.  In the class action context, it may be appropriate for a court to use *cy pres* principles to distribute unclaimed funds.  In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.

*In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682-83 (8th Cir. 2002) (internal citations omitted).  We have previously approved a district court's allocation, pursuant to the *cy pres* doctrine, of settlement funds to those class members "'most in need of help.'"  *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 145, 158 (2d Cir. 1987).

14

assets not been looted and their lives nearly destroyed."[11]  *Id.* at 117 (footnote added), *at* J.A. 835.

Needy Jewish survivors would receive 90% of the $100 million fund, and the remaining 10% would

be distributed to needy Roma, Jehovah's Witness, disabled, and homosexual survivors.[12]  *Id.* at 188,

*at* J.A. 836.

Of particular significance to the instant appeal is the Special Master's proposed geographic

allocation of funds earmarked for needy Jewish Holocaust survivors.  This allocation was guided not

by the geographic distribution of the Jewish survivors *generally*, but by the geographic distribution of

that group's *neediest* members.  In this regard, the Special Master observed:

> The Jewish survivor community is concentrated primarily in Israel,
> the former Soviet Union, North America and Europe, with additional
> concentrations in other regions including Australia, Argentina and
> elsewhere.  Their post-War experiences have been extraordinarily
> diverse.  In most Western nations, Nazi victims generally have
> benefitted from relatively strong economies and "social safety net"
> programs intended to assist the needy and the ill.  Equally significant,
> Nazi victims in the United States and Israel, as in most Western
> nations, have been eligible for a wide range of indemnification and
> restitution programs intended to provide modest to sometimes
> significant recompense for the material losses suffered at the hands
> of the Nazis and their accomplices.  However, notably absent from
> most post-Holocaust compensation programs are the victims of Nazi
> persecution who remain behind what was once the Iron Curtain.

*Id.* at 119 (footnotes omitted).  The Special Master then "earmarked" 75% (or $67.5 million) of the

funds allocated to needy Jewish Holocaust survivors "for programs assisting destitute, elderly Jewish

victims of Nazi persecution in the former Soviet Union," *id.* at 120, and approximately 4% "to

---

[11] An additional $10 million allocation would "benefit . . . all members of all five classes" by creating "a comprehensive list, available to all, of all the 'Victims or Targets of Nazi Persecution', and all of their murdered ancestors."  Special Master's Proposal at 115-16, *at* J.A. 833-34.

[12] As the Special Master explained, this 90/10 ratio was "based upon precedent" from previous allocations of recovered assets "dating back to 1945" and was "warranted by current demographics . . . of surviving 'Victims or Targets of Nazi Persecution' as defined under the Settlement Agreement."  Special Master's Proposal at 118-19, *at* J.A. 836-37.

15

needy survivors in the United States," *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 97 (E.D.N.Y. 2004).

The District Court again implemented a notice plan and received "approximately 754 communications" in response to the Special Master's Proposal. *See In re Holocaust Victim Assets Litig.*, 2000 U.S. Dist. LEXIS 20817, at *7 (E.D.N.Y. Nov. 22, 2000). Nonetheless, "the overwhelming majority of the Settlement Class members—more than 99 percent—did not submit any comment regarding the Proposed Plan and presumably had no objection." *Id.* at *7-*8. In an order of November 22, 2000, the District Court, "[a]fter carefully considering all of the comments and objections," found the Special Master's Proposal "carefully reasoned and well supported," and adopted the proposal in its entirety. *Id.* at *9-*10.

Several individuals who are not appellants here pursued an appeal from the District Court's November 22, 2000 order, challenging, *inter alia*, "(1) the inadequacy of the total settlement amount of $1.25 billion; (2) the allocation of $800 million to the 'Deposited Assets' class, including adjustments for interest, fees, and inflation; (3) the application of the doctrine of *cy pres* to resolve the claims of the 'Looted Assets' class, rather than require—or permit—claimants to put forth documentary evidence of their actual losses." *In re Holocaust Victim Assets Litig.*, 413 F.3d at 186. On July 26, 2001, we affirmed. *Id.* at 187. In doing so, we concluded

> that the district court did not abuse its discretion in allocating $800 million to the "Deposited Assets" class. The existence and estimated value of the claimed deposit accounts was established by extensive forensic accounting. In addition, these claims are based on well-established legal principles, have the ability of being proved with concrete documentation, and are readily valuated in terms of time and inflation. By contrast, the claims of the other four classes are based on novel and untested legal theories of liability, would have been very difficult to prove at trial, and will be very difficult to accurately valuate. Any allocation of a settlement of this magnitude and comprising such different types of claims must be based, at least

16

in part, on the comparative strengths and weaknesses of the asserted legal claims.

*Id.* at 186. We also found no "legal merit" in the claims that the *cy pres* doctrine had been inappropriately applied to the Looted Assets Class and that members of that class "should be allowed to provide proof of their actual loss of property." *Id.*

On August 19, 2002, the Special Master informed the District Court that, "[a]s a result of unanticipated interest and other income to the Settlement Fund . . . there are sufficient excess funds to provide for supplemental distributions to class members." Letter of Judah Gribetz, Special Master, Holocaust Victim Assets Litigation, to The Hon. Edward R. Korman, Aug. 19, 2002, at 1. The Special Master proposed that the allocation to the Looted Assets Class be increased by $45 million, and that "[t]he proportions allocated among various 'Victim or Target' groups and geographic regions . . . remain the same." *Id.* at 3-4.

In a motion dated September 23, 2002, the HSF objected to the Special Master's proposed supplemental distribution, "principally advocating for an allocation of a *proportionate* (25%) share of *all* unclaimed funds—including those now available and those that will be remaining from the $800 million set aside to pay bank account claims—for the needs of U.S. Survivors." *In re Holocaust Victim Assets Litig.*, Objections of U.S. Survivor Groups to Special Master's Recommendations Concerning Allocation of Accumulated Interest on Settlement Funds, No. CV 96-4849, at 3 (E.D.N.Y. Sept. 23, 2002) (footnote omitted) (emphasis in original).

On September 25, 2002 the District Court adopted the Special Master's recommendation. *In re Holocaust Victim Assets Litig.*, No. CV 96-4849 (E.D.N.Y. Sept. 25, 2002) (ordering a 45% increase in "annual requests for funding from the three administrative agencies distributing humanitarian *cy pres* funds to needy members of the Looted Assets Class").

17

In a memorandum of September 28, 2002, the District Court informed the HSF that its objection was received only after the District Court's order had been filed, and that the objection was, in any event, untimely. *In re Holocaust Victim Assets Litig.*, No. CV 96-4849 (E.D.N.Y. Sept. 28, 2002) (handwritten memorandum on a copy of HSF's objection). The HSF then moved for reconsideration.

On September 10, 2003, the HSF also moved in the District Court for an order "authorizing the *immediate* allocation of the sum of $200 million to be used to meet the human services needs of Class members who are currently being under served, or who would be eligible to be served, by the existing Jewish social service agencies in the United States, Israel, Europe, and other places where Survivors are in need." *In re Holocaust Victim Assets Litig.*, Motion for Immediate Interim Distribution of Swiss Settlement Proceeds, No. CV 96-4849, at 1 (E.D.N.Y. Sept. 10, 2003). The HSF requested that a "minimum" of 25% of that allocation—that is, $50 million—be earmarked for Holocaust survivors residing in the United States. *Id.* (emphasis omitted).

On October 2, 2003, the Special Master submitted to the District Court a report estimating that an additional $60 million was "available for immediate distribution for the benefit of needy victims or targets of Nazi persecution." *In re Holocaust Victim Assets Litig.*, Special Master's Interim Report on Distribution and Recommendation for Allocation of Excess and Possible Unclaimed Residual Funds, No. CV 96-4849, slip op. at 3 (E.D.N.Y. Oct. 2, 2003). The Special Master then proposed that the entire $60 million be allocated wholly to the Looted Assets Class "in accordance with the *cy pres* principles that have successfully governed the administration of the initial $100 million allocation and distribution to the Looted Assets Class in 2001, and the first supplemental allocation and distribution of $45 million in 2002." *Id.* at 4 (footnote omitted). In other words, an

additional $54 million (90% of the $60 million allocation) would be allocated to needy Jewish survivors, and 75% of that amount would be earmarked for needy Jewish survivors in the FSU.

The HSF filed its objection to the Special Master's recommendation on October 31, 2003, urging the Court to adopt instead the HSF's proposal of September 10, 2003. *In re Holocaust Victim Assets Litig.*, Response of Holocaust Survivors Foundation-USA, Inc. to Special Master's Interim Recommendation, No. CV 96-4849 (E.D.N.Y. Oct. 31, 2003). According to the HSF, "[t]he Special Master's recommendation embodies a standardless 'rough justice' paradigm in which the extreme conditions under which many elderly Nazi victims in the FSU live is deemed to override the rights of all other Looted Assets class members who also have economic need and cannot obtain vital home and health care and emergency services in their declining years." *Id.* at 3.

On November 17, 2003, the District Court adopted the Special Master's October 2, 2003 recommendation, allocating an additional $60 million to the Looted Assets Class and ordering that such funds "be allocated proportionately among the same 'Victim or Target' groups and the same geographic regions enunciated in" the original Special Master's Proposal. *In re Holocaust Victim Assets Litig.*, No. CV 96-4849, slip op. at 2 (E.D.N.Y. Nov. 17, 2003). The District Court's November 17, 2003 order noted that the HSF's objection was overruled, for reasons that would be explained in "an opinion to follow." *Id.*

## II.    Opinion of the District Court

In a memorandum and order filed on March 9, 2004, the District Court addressed the merits of the HSF's objections to supplemental allocations ordered by the Court on September 25, 2002 and November 17, 2003. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004). The District Court summarized the substance of HSF's objections as follows:

> [The HSF] agrees that funds allocated to the Looted Assets Class
> should be distributed through a *cy pres* distribution to the neediest

19

> survivors, but only after distributing the funds *pro rata* among countries. Put differently, [the HSF] argues that a survivor community in a given country should be allocated (for the benefit of its neediest survivors only) a percentage of the Looted Assets Class funds equal to whatever percentage of the world survivor community it represents.

*Id.* at 95.

The Court then provided an extensive account of historical reasons why "the population of *needy* survivors is distributed quite differently than the population of survivors." *Id.* at 98 (emphasis in original). According to the most reliable demographic statistics available to the District Court, approximately 19% to 27% of Holocaust survivors live in the FSU, while 14% to 19% live in the United States. *Id.* at 97. Yet, of the over $53 billion in restitution funds distributed since the end of the Second World War, "$14.8 billion, or just shy of 28% . . . has gone to survivors in the United States," while "just under $444 million, or 0.8% . . . has gone to survivors in the FSU." *Id.* at 98 (emphasis omitted).

Quite apart from this history of disproportionate restitution efforts, the lives of survivors in the FSU have differed drastically from the lives of survivors in Western societies. As the District Court aptly summarized, "[a]s brutal as life was under Communism, . . . the situation for many elderly pensioners has become even worse with its collapse." *Id.* at 99. In part because "the personal savings of many individuals in the FSU were wiped out by hyperinflation after the collapse of the Soviet Union, . . . approximately 60% of all elderly now living in the FSU are impoverished." *Id.* (internal quotation marks omitted).

The District Court then marshaled further statistical evidence and first-hand accounts to demonstrate that the "financial situation of individual survivors in the FSU . . . is woeful in comparison to that of survivors in the United States." *Id.* at 100-07. For example,

20

> [t]he survivor community in the FSU constitutes between 32% and 40% of the total Jewish population in the FSU. The survivor community in the United States, on the other hand, makes up only 2.5% of the Jewish population. While at first blush this statistic may appear insignificant, . . . "[t]he high percentages [of survivors] in the FSU mean that there is a comparatively small Jewish community available to support victims." This problem is exacerbated by the fact that while 56% of survivors in the United States are married and 96% have children, only 41% of survivors in the FSU are married and only 44% have children. In sum, family and community support networks are stretched thin in the FSU.

*Id.* at 100 (alterations in original) (citations omitted) (quoting and citing Andrew Hahn et al., *Jewish Elderly Nazi Victims: A Synthesis of Comparative Information on Hardship and Need in the United States, Israel, and the Former Soviet Union* (2004) (a report prepared for the American Jewish Joint Distribution Committee by researchers from Brandeis University), *available at* http://www.cmjs.org/pdf/JDCBrandeisReport01-26-04Final.pdf).

The District Court likewise emphasized the significant differences in the social safety nets available to survivors residing in the FSU relative to those residing in the United States. *Id.* at 100-07. Thus, the District Court acknowledged that a significant number of survivors in the United States are poor, but found that "the need faced [in the United States] is of a different kind than that faced by survivors in the FSU," where 55% of the settlement funds distributed by the American Jewish Joint Distribution Committee ("JDC") had been spent on hunger relief programs. *Id.* at 102, 106. The District Court concluded that the 135,000 identified destitute Jewish Holocaust victims in the FSU suffer from "particularly" acute need; indeed, they are "barely surviving." *Id.* at 99.

Finally, the District Court overruled the HSF's objections to the calculations underlying the geographic allocation of settlement funds:

> Of the Looted Assets and excess funds, I have thus far allocated to needy survivors in the FSU 18.75 times the amount I have allocated to needy survivors in the United States. If I were to assume that

21

every needy survivor deserved the same amount of money, that would mean that there should be 18.75 times more needy survivors in the FSU than there are in the United States. There are at least that many. The JDC has clearly documented at least 135,000 survivors in the FSU who are in desperate need, more than the entire survivor population in the United States. Thus, even in [the HSF's] terms, the 18.75 number would be subject to challenge only if there were more than 7,200 survivors in the United States who are in comparable distress. The empirical evidence that has been produced has not identified 7,200 such people.

*Id.* at 108.

After overruling the HSF's objections on the merits, the District Court inquired whether, in any event, the HSF had standing to raise such objections. The Court held that the HSF lacked standing, principally because the HSF failed to prove that it is a "membership corporation" with "standing to litigate on behalf of its members." *Id.* at 115-17.

The HSF, joined by several individuals and organizations, now appeals the District Court's March 9, 2004 memorandum and order.

## DISCUSSION

Before considering the merits of appellants' challenge to the District Court's allocation and distribution orders,[13] it is helpful to specify the aspects of the District Court's opinion that appellants are *not* challenging. Appellants do not dispute that the District Court may, as a general matter and in the appropriate circumstances, distribute settlement proceeds to the neediest class members,

---

[13] Lead Settlement Counsel challenges the standing of all appellants to appeal the District Court's orders. Although the District Court held that the HSF lacked standing, the standing of other appellants was neither raised before, nor addressed by, the District Court. Upon review of the record of this case, we are satisfied that at least one individual appellant, "G.K.", a needy Holocaust survivor residing in the United States, has met minimal standing requirements. We would ordinarily remand this cause to the District Court for a determination (1) whether appellants (other than the HSF and "G.K.") have standing to appeal from the District Court's orders; and (2) whether our decision that "G.K." has standing affects the standing of the HSF because "G.K." may be a member of an organization that, in turn, may be a member of the HSF. However, such a remand is not necessary here, since we address the claims of "G.K." on the merits, and the merits of her claim are identical to the merits of other appellants' claims. *See In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 197 n.7 (2d Cir. 2000) (declining to remand the question of a party's standing to the district court when the merits of that party's claims were fully adjudicated in the course of addressing claims brought by parties with standing).

22

pursuant to the *cy pres* doctrine. *See, e.g.*, Appellants' Br. at 33. Rather, they question whether the District Court exceeded the bounds of that general principle in this case by allocating funds partly on the basis of geographic disparities in the provision of basic needs.

Appellants also do not dispute the findings that underlie the District Court's initial decision to distribute the settlement funds in this case to the neediest class members—namely, the findings that (1) a case-by-case valuation of Looted Assets Class members' claims, "would have resulted in an unwieldy and enormously expensive apparatus," and (2) "[a] *pro rata* distribution would have resulted in the payment of literally pennies to each of the millions of individuals who would fall into" the Looted Assets Class. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d at 96 (internal quotation marks omitted). In any event, we have previously affirmed the District Court's use of a *cy pres* remedy in this case.

Instead, appellants ask us to review only the *manner* in which the *cy pres* distribution of funds to the neediest Looted Assets Class members was accomplished by the District Court—namely, they ask us to consider whether the District Court properly allocated the funds earmarked for needy Jewish Holocaust survivors by directing 75% of those funds to the FSU and only 4% to the United States.

As we recognized in an earlier appeal related to this litigation, "[t]he district court has broad supervisory powers with respect to the administration and allocation of settlement funds, and we 'will disturb the scheme adopted by the district court only upon a showing of an abuse of discretion,'" *In re Holocaust Victim Assets Litig.*, 413 F.3d at 185 (citing *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978), and quoting *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 179, 181 (2d Cir. 1987)). "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual

23

finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (footnotes omitted).

Appellants argue that the District Court inappropriately relied on geographic differences in Holocaust survivors' needs because these needs are largely a function of historical events that followed the injuries inflicted by the Nazi regime and by the Swiss bank defendants. We recognize that, in a traditional class action brought to remedy an injury that had occurred shortly before the initiation of suit, the amounts allocated among claimants would normally vary primarily by the effect of the injury upon different claimants, rather than by the current financial needs of the claimants. But, in the circumstances presented by this case, we think the equitable principles of the *cy pres* doctrine permit the geographic variation that the District Court adopted. As that Court pointed out, survivors residing in the FSU had been cut off by the Soviet regime from the ten prior major efforts at Holocaust reparations, and of the $53 billion that has been provided to Holocaust victims through these prior efforts, $14.8 billion or 28% has gone to survivors in the United States and only $444 million or 0.8% has gone to survivors in the FSU. *See In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d at 98. This extraordinary circumstance understandably prompted the District Court to consider the variation in *current* financial need in making the geographic allocation.

Appellants further contend that the District Court exceeded its discretion because "[n]o court" has previously allocated settlement funds by consulting the same "factors" the District Court applied here. Appellants' Br. at 32. The "factors" in question include the history of previous compensation efforts, material deprivations associated with decades of life under a Communist regime and the effects of that regime's collapse, and access to family and community support networks. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d at 97-107. Like appellants, we are

24

unaware of any other court that has relied on this particular combination of factors in allocating settlement funds. But, unlike appellants, we believe that consideration of these factors, in the circumstances presented, was entirely appropriate and well within the wide discretion afforded to the District Court.

Appellants also argue that the District Court's "totally subjective" allocation of settlement funds exceeded the bounds of proper discretion set forth in two appellate decisions concerning the scope of the *cy pres* doctrine, *In re Airline Ticket Commission Antitrust Litigation*, 268 F.3d 619 (8th Cir. 2001) ("*Airline Ticket Commission I*"), and *In re Airline Ticket Commission Antitrust Litigation*, 307 F.3d 679 (8th Cir. 2002) ("*Airline Ticket Commission II*"). Apellants' Br. at 32-33.

This contention is without merit. In *Airline Ticket Commission I*, the Eighth Circuit held that a *cy pres* allocation of settlement funds exceeds the bounds of the District Court's discretion when the district court (1) fails to offer any "indication" of having "carefully weighed all of the considerations" relevant to the allocation; and (2) makes "no findings" in connection with its distribution of funds. 268 F.3d at 626 (internal quotation marks omitted). Upon review of the record of this case, we find that the opinions of the District Court and the reports of the Special Master are not susceptible to the same criticisms. Indeed, the allocation challenged by appellants here—earmarking 75% of Looted Assets Class funds allocated to all needy Jewish survivors to needy Jewish survivors in the FSU—was rendered after the District Court carefully weighed all relevant considerations and made numerous factual findings. *See In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d at 97-107. Under the standard set forth in *Airline Ticket Commission I*, the District Court acted well within its discretion, and we find no support in the record of this case for appellants' suggestion that the Court acted in a "totally subjective" manner.

In *Airline Ticket Commission II*, the Eighth Circuit again reversed the district court's allocation of the same settlement funds because, on remand, the district court had allocated the funds to an entity that could not "claim any relation to the substantive issues" of the underlying litigation. 307 F.3d at 683. Furthermore, an alternative allocation rejected by the district court in *Airline Ticket Commission II* "would [have] relate[d] directly" to the injuries alleged in that case. *Id.* Contrary to appellants' view, the circumstances of *Airline Ticket Commission II* bear no resemblance to the instant litigation. The suffering of Holocaust survivors everywhere relates directly to the looting they suffered at the hands of the Nazis and their accomplices. More significantly, the claims of needy American Holocaust survivors, whose interests the HSF purports to advocate, are no more related to the underlying litigation against Swiss banks than the claims of needy survivors in the FSU. In short, appellants' reliance on the *Airline Ticket Commission* decisions is entirely misplaced.

Finally, we inquire whether the District Court acted within the bounds of its discretion by rejecting the HSF's proposed alternative to the District Court's allocation methodology. The HSF, it must be recalled, challenges the District Court's decision to distribute funds in accordance with the geographic distribution of *needy* Holocaust survivors. Instead, the HSF proposes the following methodology: (1) "allot[ ] funds geographically," presumably in proportion to *total* survivor population and without regard to need; and (2) "within" each "geographical region," distribute funds "according to need." Appellants' Br. at 33.

There are at least two reasons why the District Court did not exceed its discretion by rejecting the HSF's proposed allocation methodology. First, the HSF's methodology implies that Jewish Holocaust survivors who reside in the United States today are legally entitled to a particular share of the settlement fund based on their *total* number (rather than the number of *needy* survivors among them). We find no legal or equitable support for this view. Members of the Looted Assets

26

Class (whether they currently reside in the United States, the FSU, or elsewhere) were persecuted sixty years ago, principally in Europe, but it is well-documented that their experiences in the intervening decades have differed dramatically. As the Lead Settlement Counsel aptly argues, "[t]he accident of current residence is utterly unconnected with the events giving rise to this litigation, and is irrelevant to any principled basis for allocating the funds." Lead Settlement Counsel's Br. at 47.

Second, the District Court articulated a compelling equitable reason to reject the HSF's proposed allocation methodology. As a logical matter, this methodology "is tailored to benefit individuals who are a part of a small group of needy survivors within a large nationwide survivor population." *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d at 95. Needy survivors in the United States are precisely the group that stands to gain, since the United States' share of *needy* Holocaust survivors is substantially less than United States' share of *all* Holocaust survivors. *Id.* But from the perspective of the *worldwide* population of needy Holocaust survivors—the population for the benefit of which the funds allocated to the Looted Assets Class are being distributed—there is nothing equitable about an allocation methodology that provides the "relatively few needy survivors" in the United States "with a disproportionate benefit solely because of the overall size of the survivor community in the United States." *Id.* at 109. Accordingly, the District Court concluded that the HSF's allocation methodology is "arbitrary and unreasonable." *Id.* We need not decide today whether appellants' proposal is indeed so inequitable as to be "arbitrary and unreasonable," for our standard of review is far more deferential. We may merely inquire whether the District Court had the discretion to adopt a different allocation plan. For the reasons set forth above, we hold that it did.[14]

---

[14] One of plaintiffs' class counsel in this litigation, Robert Swift, has requested that we remand this cause to the District Court "with instructions barring any further *cy pres* distributions until [the District Court] has rendered a decision as to the final distribution" of all Deposit Assets Class funds likely to remain unclaimed—funds Swift estimates at $600 million. Appellee Class Br. at 4, 9. At this time, it is neither necessary nor appropriate for us to interfere in the

## CONCLUSION

The allocation and distribution of this historic settlement began with "a desire to spare Holocaust survivors from being forced into an adversarial relationship that would have required them to squabble over a settlement fund that, while substantial, is necessarily insufficient to do full justice" to the victims of Nazi persecution. *In re Holocaust Victim Assets Litig.*, Submission of Lead Settlement Counsel in Support of the Special Master's Proposed Plan of Allocation and Distribution of Settlement Proceeds, No. CV 96-4849, at 3 (E.D.N.Y. Nov. 20, 2000).

More than six years after the creation of the settlement fund, the desired harmony among its beneficiaries has not been achieved. Indeed, the instant appeal is but one of a series of challenges to the District Court's allocation and distribution orders. Yet the objections raised by appellants here—and the zeal with which these objections have been pursued[15]—have in no way undermined the thoughtful analysis and scrupulous fairness with which Chief Judge Korman has approached every step of this litigation.

We have carefully considered all arguments raised by appellants and we find each of them to be without merit. Accordingly, the District Court's memorandum and order of March 9, 2004 is hereby affirmed.

---

discretionary judgments of the District Court in the manner Swift suggests. Without commenting on the merits of Swift's request, we deny it, but we do so without prejudice to a similar request being made to the District Court in due course.

[15] The HSF's appellate brief averts to the District Court's "flawed judicial process," referring principally to (1) the District Court's approval of the Settlement Agreement before adopting a plan for distributing and allocating settlement funds; and (2) alleged "assurances by the Lead Class Counsel and the court that the initial allocation imbalance would be rectified with subsequent distributions of larger amounts" for the benefit of survivors residing in the United States. Appellants' Br. at 26. The HSF characterizes these purported procedural irregularities as "examples" by which this Court's "examination" of the merits of this appeal would be "informed." *Id.* at 17, 20.

Upon carefully reviewing the record of this case, we find no evidence whatsoever of a "flawed judicial process." To the contrary, the careful consideration that the District Court, the Special Master, and the Lead Settlement Counsel have accorded to every step in the allocation and distribution of this historic settlement are exemplary.